881 A.2d 700

LOUIS MAISONAVE AND MYRNA MAISONAVE, HIS WIFE, PLAINTIFFS–RESPONDENTS, v. THE NEWARK BEARS PROFESSIONAL BASEBALL CLUB, INC. AND GOURMET DINING SERVICES, DEFENDANTS–APPELLANTS, AND ABC CORP. (NAME BEING FICTITIOUS) AND JOHN DOE (NAME BEING FICTITIOUS), DEFENDANTS.

Argued February 14, 2005—Decided September 13, 2005.

72

*James J. Horan* argued the cause for appellant Gourmet Dining Services (*Mautone & Horan*, attorneys).

*Timothy J. Schipske* argued the cause for appellant The Newark Bears Professional Baseball Club, Inc. (*Rawle & Henderson*, attorneys).

*Frank DiGiovanni* argued the cause for respondents (*Kessler, DiGiovanni & Jesuele*, attorneys).

Justice ZAZZALI delivered the opinion of the Court.

The first recorded baseball game took place at the Elysian Fields in Hoboken on June 19, 1846. Leonard Koppett, *Koppett's Concise History of Major League Baseball* 7 (2004). Since then, the game has become an integral part of our American identity

and has emerged as an ever-expanding business. George F. Will, *Bunts* 28 (1999) ("The business of America is business, and so, of course, is the national pastime."); *see also Flood v. Kuhn*, 407 *U.S.* 258, 282, 92 *S.Ct.* 2099, 2112, 32 *L.Ed.*2d 728, 743 (1972) ("Professional baseball is a business and is engaged in interstate commerce."). Between 1994 and 2001, eight minor league stadiums opened in New Jersey alone. As an increasing number of citizens flock to competitive baseball games, we confront difficult questions of tort liability.

Here, a foul ball struck plaintiff in the face as he purchased a beverage from a mobile vending cart on the concourse of a minor league stadium. The Appellate Division reversed the trial court's grant of summary judgment in favor of the stadium owners and operators, holding that the trial court erred in finding that defendants had not violated their duty of care as a matter of law.

In this appeal, we survey the law that has evolved concerning owner and operator liability and examine the boundaries of the limited duty rule. In doing so, we must accommodate the interests of both fans and owners. We hold that the limited duty rule, which restricts the tort liability of owners, applies in situations where an injury occurs in the stands. However, public policy and fairness require application of traditional negligence principles in all other areas of the stadium, including, but not limited to, concourses and mezzanine areas.

I.

Plaintiff Louis Maisonave suffered a facial injury when a foul ball struck him in the eye as he stood on the mezzanine at Riverfront Stadium, home field of minor league baseball team, The Newark Bears. The mezzanine is an open walking area exposed on one side to the baseball field. Vendors sell food and beverages on that level, and restrooms are located there. At the time of the incident, the stadium used movable vending carts for the sale of beverages because construction of the stadium had not yet been completed, and the built-in concession stands were not operational.

The carts dotted the mezzanine along both the first and third base lines on the field-side of the mezzanine. The vendors stood with their backs to the diamond while the patrons faced it.

Plaintiff, who had watched the action at a railing on the first base side of the field, walked about 100 feet to the closest vending cart. Netting protects the seating area behind home plate and extends for some distance down both base lines. The beverage cart that plaintiff patronized was on the first base line, but beyond the protection of the net. In a written statement, Maisonave described the moments before the incident:

I wasn't consciously aware of where the netting was or where it ended. From the time I reached the vending cart, *I had not actually watched the field;* I was aware the game was being played by the crowd reaction, but *I wasn't able to see the field* .... Standing at the beverage cart before I was hit I was not thinking about the possibility of a foul ball coming at me. I didn't think anything could happen to me there.

[ (Emphasis added.) ]

At his deposition, plaintiff described the incident:

Q. What were you doing during that five or ten minutes? *Were you trying to watch the game?*

A. *No, I was talking with some people on line.*

\* \* \*

Q. And did the vendors move?

A. Well, the vendor I know ducked kind of sideways because when they said look out, the last thing I saw was her moving out of the way and the ball coming.

Q. *You were not aware of this ball previous to that moment?* In other words, did you see the pitcher throw the ball at the batter? *Did you see the batter swing at the ball?*

A. *No.*

Q. *Did you see the ball leave the bat?*

A. *Nothing, nothing.*

[ (Emphasis added.) ]

The batted ball struck plaintiff in the right eye, causing numerous fractures and persistent numbness in the area of the eye, drooping of the eye, problems with his sinuses, and scarring.

Alleging negligence, plaintiff sued The Newark Bears Professional Baseball Club, Inc., which leases Riverfront Stadium from

the Essex County Improvement Authority, and defendant Gourmet Dining Services, which provides food and beverage services to Riverfront Stadium. The trial court granted summary judgment in favor of defendants, finding that they had not breached their duty of care. In reaching that conclusion, the trial court relied on *Schneider v. American Hockey & Ice Skating Center, Inc.*, 342 *N.J.Super.* 527, 533–34, 777 *A.*2d 380 (App.Div.), *certif. denied,* 170 *N.J.* 387, 788 *A.*2d 772 (2001), which set forth a two-pronged duty of care for stadium owners and operators:

[F]irst, the operator must provide protected seating "sufficient for those spectators who may be reasonably anticipated to desire protected seats on an ordinary occasion," and second, the operator must provide protection for spectators in "the most dangerous section" of the stands. The second component of this limited duty ordinarily may be satisfied by the operator providing screened seats behind home plate in baseball and behind the goals in hockey.

[ (Citations omitted.) ]

The trial court reasoned that the provision of "at least two vending carts close to home plate and behind the screening, which plaintiff could have utilized," established that defendants had not breached their limited duty to plaintiff and, therefore, were not liable to plaintiff as a matter of law.

The Appellate Division reversed and remanded. *Maisonave v. Newark Bears, Gourmet Services,* 371 *N.J.Super.* 129, 134, 852 *A.*2d 233 (2004). Citing *Schneider,* the panel agreed that "the operators of a commercial sports facility owe a limited duty to spectators." *Id.* at 133, 852 *A.*2d 233 (citations and internal quotation marks omitted). However, focusing on the second part of the *Schneider* limited duty rule, the Appellate Division stated:

When we said that the second component [of *Schneider* ] "may be satisfied by the operator providing screened seats behind home plate in baseball and behind the goals in hockey[,]" our identification of those locations was not intended to be exhaustive nor immutable. Rather, "the measure of that duty is 'due care under all the circumstances.'"

[*Ibid.* (citations omitted).]

We granted certification on the separate applications of defendants. 182 *N.J.* 142, 861 *A.*2d 846 (2004). For the reasons discussed below, we affirm and modify the decision of the Appellate Division.

In our analysis, we consider general principles of tort liability, including the business invitee rule and its application to commercial establishments. Next, we examine the limited duty rule as an exception to the business invitee rule, its origins, its application in New Jersey and other jurisdictions, and concerns about the rule. We then determine whether we should adopt the limited duty rule, and if so, to what extent it should apply to the stands and to other areas of the stadium.

## II.

### A.

In *Hopkins v. Fox & Lazo Realtors,* we held that a landowner "owe[s] a duty of reasonable care to guard against any dangerous conditions on his or her property that the owner either knows about or should have discovered." 132 *N.J.* 426, 434, 625 *A.*2d 1110 (1993) (citing *Handleman v. Cox,* 39 *N.J.* 95, 187 *A.*2d 708 (1963); *Restatement (Second) of Torts* § 343 (1969)). This is the standard of care generally applied to business enterprises and is the default governing standard unless a more specific rule applies. Although it applied the limited duty rule, our Appellate Division recognized in *Schneider* that "the operator of a commercial recreational facility, like the operator of any other business, has a general duty to exercise reasonable care for the safety of its patrons." 342 *N.J.Super.* at 534, 777 *A.*2d 380.

### B.

The limited duty rule is a specialized negligence standard that has protected stadium owners and operators since the early days of modern baseball. For example, in *Crane v. Kansas City Baseball & Exhibition Co.,* 168 *Mo.App.* 301, 153 *S.W.* 1076, 1078 (1913), the court held that stadium operators must offer protected seating areas and that a spectator who chose an unprotected seat was contributorily negligent. In *Quinn v. Recreation Park Ass'n,* 3 *Cal.*2d 725, 46 *P.*2d 144, 146 (1935), the court held that "[t]he

duty imposed by law is performed when screened seats are provided for as many as may be reasonably expected to call for them on any ordinary occasion." (Citations omitted.) Since the early twentieth century, courts have held that "one of the natural risks assumed by spectators attending professional games is that of being struck by batted or thrown balls." *Ibid.* Even a brief review of several early baseball cases reveals that many courts that adopted the rule, or a version of it, based their decisions on two facts: that the danger of errant balls was common knowledge and that spectators sitting in unscreened seats assumed the risk of injury. *See, e.g., Brisson v. Minneapolis Baseball & Athletic Ass'n,* 185 *Minn.* 507, 240 *N.W.* 903 (1932); *Kavafian v. Seattle Baseball Club Ass'n,* 105 *Wash.* 215, 181 *P.* 679 (1919). Thus, the rule establishes a fact-specific standard of care for injuries caused by errant balls at baseball stadiums by accounting for the open and obvious nature of the risk that batted balls pose to fans.

In *Schneider, supra,* our Appellate Division endorsed the limited duty rule, explaining that stadium operators must "provide protected seating sufficient for those spectators who may be reasonably anticipated to desire protected seats on an ordinary occasion." 342 *N.J.Super.* at 534, 777 *A.*2d 380 (internal quotation marks and citation omitted). Additionally, stadium operators must "provide protection for spectators in the most dangerous section of the stands." *Ibid.* (internal quotation marks and citation omitted).

C.

The scope of the duty that the owners and operators of baseball stadiums owe their patrons is a question of first impression for this Court. However, about one-half of the states have previously addressed this issue.[1] Our research reveals that eleven of those

---

[1] *See generally* James L. Rigelhaupt, Jr., Annotation, *Liability to Spectator at Baseball Game Who Is Hit by or Injured as Result of Other Hazards of Game,* 91 *A.L.R.*3d 24 (1979) (electronically updated as of 2005).

jurisdictions have adopted the limited duty rule.[2] Some states have not applied the rule and instead have adopted baseball-specific statutes.[3] Finally, some courts have applied traditional negligence principles, such as the business invitee rule or comparative negligence.[4]

There is no gainsaying that the limited duty rule has its advocates. Many "believe [it] to be the better rule and adopt [that] definition of the duty owed by an owner of a baseball field to provide protective screening for its spectators." *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 441 N.Y.S.2d 644, 424 N.E.2d 531, 533 (1981); *see also Lawson v. Salt Lake Trappers, Inc.*, 901 P.2d 1013, 1015 (Utah 1995) ("The [limited duty] rule insures that those spectators desiring protection from foul balls will be accom-

---

[2] The following jurisdictions have explicitly adopted the limited duty rule: California (*Rudnick v. Golden W. Broadcasters*, 156 Cal.App.3d 793, 202 Cal.Rptr. 900 (1984)); Iowa (*Arnold v. City of Cedar Rapids*, 443 N.W.2d 332 (Iowa 1989)); Louisiana (*Lorino v. New Orleans Baseball & Amusement Co.*, 16 La.App. 95, 133 So. 408 (1931)); Michigan (*Benejam v. Detroit Tigers, Inc.*, 246 Mich.App. 645, 635 N.W.2d 219 (2001)); Minnesota (*Brisson v. Minneapolis Baseball & Athletic Ass'n*, 185 Minn. 507, 240 N.W. 903 (1932)); Missouri (*Anderson v. Kansas City Baseball Club*, 231 S.W.2d 170 (Mo.1950)); New York (*Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 441 N.Y.S.2d 644, 424 N.E.2d 531 (1981)); North Carolina (*Cates v. Cincinnati Exhibition Co.*, 215 N.C. 64, 1 S.E.2d 131 (1939)); Ohio (*Cincinnati Baseball Club Co. v. Eno*, 112 Ohio St. 175, 147 N.E. 86 (1925)); Texas (*Friedman v. Houston Sports Ass'n*, 731 S.W.2d 572 (Tex.App.1987)); Utah (*Lawson v. Salt Lake Trappers, Inc.*, 901 P.2d 1013 (Utah 1995)).

[3] *See* Colorado Baseball Spectator Safety Act of 1993, Colo.Rev.Stat. § 13–21–120 (1993); Baseball Facility Liability Act, Ill. Comp. Stat. 38/1–49 (1992).

[4] *See, e.g., City of Milton v. Broxson*, 514 So.2d 1116, 1118 (Fla.Dist.Ct.App. 1987) (holding that "liability must be determined by the common law standards ... governing the duty of landowners to invitees"); *Bellezzo v. Arizona*, 174 Ariz. 548, 851 P.2d 847, 850 (Ct.App.1993) (holding that "[b]ecause [plaintiff] was an invitee, the applicable standard of care obligated appellees to discover and warn or protect ... against unreasonable risk of harm"); *Jones v. Three Rivers Mgmt. Corp.*, 483 Pa. 75, 394 A.2d 546 (1978) (discussed further in Part IV below). *See also Costa v. Boston Red Sox Baseball Club*, 61 Mass.App.Ct. 299, 809 N.E.2d 1090, 1092–93 (2004) (holding only duty is to warn of unreasonable dangers which do not include foul balls).

modated and that seats in the most dangerous area of the stadium will be safe. At the same time, [it] recognizes baseball tradition and spectator preference by not requiring owners to screen the entire stadium." (internal citations omitted)).

That said, there are concerns about the rule. For example, Chief Judge Cooke of the New York Court of Appeals has identified its troubling aspects, describing the standard as

an unfortunate exercise in judicial rule making in an area that should be left to the jury. This attempt to precisely prescribe what steps the proprietor of a baseball field must take to fulfill its duty of reasonable care is unwarranted and unwise
. . . .

This rule of law denies recovery to injured spectators as effectively as the old doctrines of assumption of the risk and contributory negligence ever did, and uses a fundamentally similar rationale to do so.

[*Akins, supra,* 441 *N.Y.S.*2d 644, 424 *N.E.*2d at 535, 537 (Cooke, C.J., dissenting).]

In 2002, when an errant puck struck and killed a thirteen-year-old girl attending a National Hockey League game in Ohio, the media intensified its focus on safety issues in both hockey arenas and baseball stadiums. *See* Phil Taylor, *Death of a Fan, Sports Illustrated,* Apr. 1, 2002, at 59; Steve Politi, *Spotlight on Safety After Fan Death, Star–Ledger* (Newark, N.J.), Mar. 21, 2002, at 33. Since that time, some critics have described the limited duty rule as "hopelessly anachronistic," David Horton, Note, *Rethinking Assumption of the Risk and Sports Spectators,* 51 *UCLA L.Rev.* 339, 365 (2003), and have noted that "stadium owners are so insulated from legal responsibility that they are under 'little pressure to add more protection for fans,'" *id.* at 344–45 (quoting Politi, *supra* ).

## III.

With the above case law and commentary as a backdrop, we consider whether the limited duty rule should apply to stadiums, and, more specifically, to the stands. In doing so we are mindful that "[r]ecognition of a duty of care, ultimately, rests on considerations of public policy and on notions of fairness." *Crawn v. Campo,* 136 *N.J.* 494, 503, 643 *A.*2d 600 (1994).

As the Appellate Division aptly observed, "[w]hile watching the game, either seated or standing in an unprotected area, spectators reasonably may be expected to pay attention and to look out for their own safety." *Maisonave, supra,* 371 *N.J.Super.* at 134, 852 A.2d 233. It is the well-understood nature of the game that batted or thrown baseballs can land in the stands. Indeed, "most spectators prefer to sit where they can have an unobstructed view of the game and are willing to expose themselves to the risks posed by flying balls ... to obtain that view." *Schneider, supra,* 342 *N.J.Super.* at 534, 777 A.2d 380. Moreover, professional baseball is a unique sport because fans actively engage in the game by trying to catch foul balls. Fans often greet out-of-play baseballs with cheers as they dive over walls and rows of seats, risking life and limb, for the thrill of triumphantly claiming the errant ball.

Although it has drawn criticism, we are not prepared to say that the rule's time has come and passed. It would be unfair to hold owners and operators liable for injuries to spectators in the stands when the potential danger of fly balls is an inherent, expected, and even desired part of the baseball fan's experience. Moreover, owners and operators would face undue hardship if forced to guarantee protection for all fans in the stands from every fly ball. Because the limited duty rule fairly balances the practical and economic interests of owners and operators with the safety and entertainment interests of the fans, we adopt the Appellate Division's opinion in *Schneider,* to the extent that it holds that owners and operators must offer sufficient protected seating to those who would seek it on an ordinary basis and to provide screening in the most dangerous sections of the stands.

In the interest of clarity, we note that the term "stands" includes the stairs that fans ascend and descend to access their seats in the stands. Similarly, areas immediately adjacent to the stands designated as "standing room only," and dedicated solely to viewing the game, fall within the purview of the limited duty rule. In contrast, multi-purpose areas, such as concourses and play-

ground areas, are outside the scope of the rule, as discussed below.

Finally, as the Appellate Division recognized in its opinion below, the measure of the operator's duty is "due care under all the circumstances" under New Jersey's interpretation of the limited duty rule. *Ibid.* (internal quotation marks and citations omitted). We expect owners and operators—who are in the best position to determine which areas of the stadium are indeed the most dangerous—to identify those areas and take preventive steps to ensure fan safety to a reasonable extent. For example, concerns arise in many areas of the stadium because baseballs

> hit into the unscreened seats are actually faster than those balls hit directly behind the screened home plate area.... Traditionally, balls hit straight back are hit with the bat coming underneath the ball, which takes off some of the speed. In contrast, line drive fouls (most frequently right down the foul lines) are normally hit flush, and send the ball at a higher velocity down the line and into the stands. [Gil Fried, *Baseball Spectators' Assumption of Risk: Is It 'Fair' or 'Foul'?*, 13 *Marq. Sports L.Rev.* 39, 58 (2002) (internal citation omitted).]

Thus, owners and operators must reassess whether there is a sufficient amount of protected seating available "in the 'most dangerous' locations for those that might reasonably expect to obtain such seats." *Ibid.*

## IV.

We now must decide whether the limited duty rule should apply to areas other than the stands. To assist our analysis, we examine the developing law, principles of fairness, and related considerations. *See Crawn, supra,* 136 *N.J.* at 503, 643 *A.*2d 600 ("Recognition of a duty of care, ultimately, rests on considerations of public policy and on notions of fairness.").

## A.

Some jurisdictions, as noted above, have applied common law principles, rather than the limited duty rule, to resolve litigation between fans injured in the stands and stadium owners and operators. It appears that Pennsylvania is the only jurisdiction

that has addressed the factually distinct issue of an injury to a patron in an area of the stadium other than the stands. In *Jones v. Three Rivers Management Corp.*, 483 *Pa.* 75, 394 *A.*2d 546 (1978), the plaintiff was injured by a batted ball as she walked along the stadium concourse with her back to the playing field. Recognizing that a different standard of care might apply in the situation before it, the Supreme Court of Pennsylvania framed the issue as "whether [plaintiff's] case is governed by the 'no duty' rule applicable to common, frequent and expected risks of baseball or by the ordinary rules applicable to all other risks which may be present in a baseball stadium." *Id.* at 551. The court held that the trial court had erred in applying the "no duty" rule in that circumstance, *id.* at 552, and concluded that "[i]t was for the jury to determine the question of appellees' negligence," *id.* at 553.

Like Pennsylvania, we recognize that a different standard of care may be appropriate for areas of the stadium outside of the stands. We have held that "New Jersey tolerates immunities only for important reasons of public policy and in relatively exceptional situations, and therefore strongly endorses a standard of care based on ordinary negligence." *Crawn, supra,* 136 *N.J.* at 502, 643 *A.*2d 600. Thus, in considering the appropriate standard of care for areas of the stadium other than the stands, and in harmonizing the interests of fans and owners, "the nature of risks[ ] and considerations of public policy and fairness ... must inform our determination." *Id.* at 503, 643 *A.*2d 600.

### B.

Applying principles of fairness, as *Crawn* requires us to do, we recognize that, since the birth of the baseball rule, "both sports and tort law have undergone massive transformations." Horton, *supra,* 51 *UCLA L.Rev.* at 343. While the baseball "event" has been evolving, tort law has shifted from a *caveat emptor* approach to one that generally requires defendants to assume more responsibility. *Id.* at 365. As a consequence, there is a "pragmatic difficulty [in] applying an old rule to a sport that has changed

tremendously in the last seventy years." *Id.* at 365–66. Thus, "[s]ports viewership has significantly changed over the years, but most courts have yet to embrace this change." Fried, *supra,* 13 *Marq. Sports. L.Rev.* at 54. Because "the beauty of common law is the ability to adapt to the times[,]" *ibid.,* we now consider whether our rule requires refinement.

Transformations in tort law and the game of baseball suggest boundaries to the limited duty rule. Specifically, "new training techniques and technologies have made play faster and players stronger." Horton, *supra,* 51 *UCLA L.Rev.* at 343–44. Ballparks now "present a sensory overload of distractions." Tom Verducci, *Safety Squeeze, Sports Illustrated,* Apr. 1, 2002, at 64. The limited duty rule does not accommodate all of the activities that are part of today's game, nor does it take into account that players can hit baseballs harder and farther.

The validity of the baseball rule diminishes in the context of injuries that occur in stadium areas other than the stands. Fans foreseeably and understandably let down their guard when they are in other areas of the stadium. Once the fan has disengaged him- or herself from the activity on the field and has left the stands, that individual is no longer trying to catch foul balls or even necessarily watching the game. It is all "harmless fun -- until that one foul ball comes screaming at the wrong time and in the wrong place." Fried, *supra,* 13 *Marq. Sports L.Rev.* at 57. The fact that "[c]hildren and seniors are an important part of minor league" games, Verducci, *supra,* at 64, underscores our concern.

Nothing about the game of baseball distinguishes it from other businesses in a way that justifies preferential treatment for stadium owners and operators for injuries that occur outside of the stands. Indeed, in areas outside of the stands, including concourses and mezzanines such as the one in this appeal, a commercial sports facility is no different than any other commercial establishment, and we do not hesitate to apply general negligence principles in virtually all other tort situations and the

specialized business invitee rule to commercial enterprises. As the Appellate Division noted in addressing this appeal,

[t]he defendants are engaged in a commercial venture which by its nature induces spectators to let down their guard. They have a concomitant duty to exercise reasonable care to protect them during such *times of heightened vulnerability*. The imposition of a duty under these circumstances ... is not only fair but reasonable.

[*Maisonave, supra,* 371 *N.J.Super.* at 134, 852 *A*.2d 233 (emphasis added).]

We agree with that analysis and conclude that "times of heightened vulnerability" include all situations in which a patron is no longer in the stands.

## C.

Because principles of fairness, and by implication public policy, support the application of traditional tort concepts to areas outside of the stands, we will not expand the scope of the baseball rule past its logical and appropriate borders, that is, the stands. *Cf. Crawn, supra,* 136 *N.J.* at 503, 643 *A*.2d 600. To apply the baseball rule to the entire stadium would convert reasonable protection for owners to immunity by virtually eliminating their liability for foreseeable, preventable injuries to their patrons even when the fans are no longer engaged with the game. "The wisdom of eschewing such blanket rules where negligence is concerned is obvious." *Akins, supra,* 441 *N.Y.S.*2d 644, 424 *N.E.*2d at 536 (Cooke, C.J., dissenting).

We do not impose strict liability for owners in areas outside of the stands; such a bright-line rule would impose an onerous burden on owners and operators. We simply apply traditional tort principles and conclude that the proper standard of care for all other areas of the stadium is the business invitee rule, which provides that a landowner "owe[s] a duty of reasonable care to guard against any dangerous conditions on his or her property that the owner either knows about or should have discovered." *Hopkins, supra,* 132 *N.J.* at 434, 625 *A*.2d 1110.

## D.

Regrettably, the dissent misapplies basic concepts of tort law, focusing as it does on some notion that the plaintiff's "geographic location when injured," *post* at 89, is an improper premise in the duty calculus. That notion is especially odd in light of the dissent's adoption of the limited duty rule for the "geographic location" of the entire stadium. Our differences, rhetoric aside, seem only to be about the *scope* of the geographic area to which the limited duty rule applies.

■ The limited duty rule is an exception to general negligence principles, and more particularly, to the application of the business invitee standard of care in the commercial context. The dissent apparently prefers not to consider public policy and fairness concepts if the result is to hold the owner of the commercial enterprise responsible for its negligence when it does not adequately protect its business invitees, at least outside of the spectator seating areas. But, the Court is required by its common law precedents to examine the owner's duty in those circumstances, and to consider which of the parties is best able to bear the burden of foreseeable harm within the stadium. *See Carter Lincoln–Mercury, Inc. v. EMAR Group, Inc.*, 135 *N.J.* 182, 194, 638 *A.2d* 1288 (1994) (holding that relationship between plaintiff and tortfeasor, nature of risk, and ability and opportunity to exercise care are relevant concerns to imposition of duty); *see, e.g., Bd. of Educ. of City of Clifton v. W.R. Grace Corp.*, 258 *N.J.Super.* 94, 113, 609 *A.2d* 92 (stating that public interest dictates that cost of defective construction should be borne by party who created danger and who is in better economic position to bear the loss rather than by victim). In the dissent's view, clearly, a decision tethered in "either law or proper public policy," *post* at 98, would relieve the stadium owner, who is in the best position to protect its patrons, of any responsibility anywhere on its business premises regardless of its negligence. This we decline to do.

## V.

To recapitulate, the limited duty rule, as set forth above and in *Schneider*, will apply to injuries occurring in the stands. However, traditional rules of negligence, specifically the business invitee rule, will govern owner and operator liability for injuries that occur in all other areas of the stadium. That adjustment of the ground rules is a fair and appropriate accommodation of the competing interests.

We remand this matter to the trial court for application of the standard we have set forth in this opinion to all future proceedings in this matter. The judgment of the Appellate Division is affirmed as modified.

Justice WALLACE, JR., concurring.

I concur with the result in the majority opinion that traditional negligence principles apply to plaintiff's injury in the concourse of a baseball stadium. However, because I agree with the comment that the limited duty rule is "hopelessly anachronistic," David Horton, Comment, *Rethinking Assumption of Risk and Sports Spectators*, 51 *UCLA L.Rev.* 339, 365 (2003), I write separately.

Whether it is called the "limited duty" rule or the "baseball" rule, and I use those terms interchangeably, this appeal presents this Court with the opportunity to evaluate the public policy underlying stadium owner and operator liability. I would reject the limited duty rule and apply traditional tort principles throughout the entire baseball stadium.

## I.

This Court must first decide whether a duty of care exists in this specific circumstance. As we restated in *Crawn v. Campo*, 136 *N.J.* 494, 503, 643 *A.2d* 600 (1994), " '[t]he imposition of a duty is the conclusion of a rather complex analysis that considers the relationship of the parties, the nature of the risk—that is, its foreseeability and severity—and the impact the imposition of a

duty would have on public policy.' " (quoting *Dunphy v. Gregor*, 136 *N.J.* 99, 108, 642 *A.*2d 372 (1994)). "When the court determines that a duty exists and liability will be extended, it draws judicial lines based on fairness and policy." *Kelly v. Gwinnell*, 96 *N.J.* 538, 544, 476 *A.*2d 1219 (1984).

### A.

As the majority opinion explains, the limited duty rule is a " 'two-prong' test" used to "defin[e] the duty of a stadium owner to provide protected seats for its patrons." Gil Fried and Robin Ammon, *Baseball Spectators' Assumption of Risk: Is It 'Fair' or 'Foul'?*, 13 *Marq. Sports L.Rev.* 39, 44 (2002). Under the first prong of that test, the stadium owner and operator "must provide protected seating 'sufficient for those spectators who may be reasonably anticipated to desire protected seats on an ordinary occasion,' " and under the second prong the stadium owner and operator "must provide protection for spectators in 'the most dangerous section' of the stands." *Schneider v. Am. Hockey & Ice Skating Ctr., Inc.*, 342 *N.J.Super.* 527, 533–34, 777 *A.*2d 380 (App.Div.)(quoting *Akins v. Glens Falls City Sch. Dist.*, 53 *N.Y.*2d 325, 441 *N.Y.S.*2d 644, 424 *N.E.*2d 531, 533 (1981)), *certif. denied*, 170 *N.J.* 387, 788 *A.*2d 772 (2001).

The limited duty rule suggests that the area behind home plate is the most dangerous section of the stadium and requires the most protection. But, as the majority opinion makes clear, the area behind home plate is not the only dangerous section of a stadium. In fact,

[t]he best seats are the worst. A spot behind or next to a dugout gives a baseball fan the opportunity to ... dodge potentially lethal projectiles whizzing at more than 100 [miles per hour]. Unprotected by netting, such seats are among the most dangerous in sports.

\* \* \*

[N]o more dangerous seats exist than the ones behind and near the third base dugout when two righthanded power pitchers are starting. The lineups are usually loaded with lefthanded hitters who are likely to swing late at fastballs, whistling

foul balls into the stands. Fans in those danger zones need to pay attention to each pitch as closely as the third baseman does.

Such seats are particularly dangerous for parents with infants (babies should not even be allowed there), children (how many elementary school kids are riveted to each pitch for a three-hour game?) and the elderly (slowed reaction time makes them vulnerable). Children and seniors are an important part of minor league and spring training games, typically held in small ballparks in which even the premium seats are affordable. The risk, however, is enormous for even the most athletic onlookers. In 1992 California Angels pitcher Matt Keough was hit in the right temple and nearly killed by a line drive while seated in the dugout of Scottsdale Stadium in Arizona. A fence was installed in front of the dugout for the safety of the players and staff.

[Tom Verducci, *Safety Squeeze, Sports Illustrated,* Apr. 1, 2002, at 64.]

### B.

In my view, fairness and policy dictate that we treat owners and operators of commercial sports facilities the same as we treat other commercial property owners. Therefore, I would apply the business invitee rule, under which the stadium owner and operator would owe a duty "to conduct a reasonable inspection to discover latent dangerous conditions," and the stadium owner and operator would have a duty to "guard against any dangerous conditions . . . that the owner either knows about or should have discovered." *Parks v. Rogers,* 176 *N.J.* 491, 497–98 n. 3, 825 *A.*2d 1128 (2003)(quoting *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 434, 625 *A.*2d 1110 (1993)). Moreover, under certain conditions the landowner has a duty to protect business visitors from foreseeable criminal acts. *Clohesy v. Food Circus Supermarkets, Inc.,* 149 *N.J.* 496, 516–17, 694 *A.*2d 1017 (1997) (holding landowner had duty to provide security in parking lot "to protect its invitees from criminal acts of third parties"). There is nothing about the game of professional baseball that distinguishes it from other businesses that would justify preferential treatment for stadium owners and operators regarding their liability to patrons in the stands. I can find no reasonable justification for applying a lesser standard for stadium owners and operators.

We often look to the Restatement for guidance in declaration of the common law. According to the Restatement (Third) of Torts,

in addressing the relationship of assumption of risk and defendant's negligence,

[a] plaintiff who is actually aware of a reasonable risk and voluntarily undertakes it, as when a parent tries to rescue a child from a fire, is not negligent. The parent may, however, be negligent for other reasons, such as the manner of the rescue. When a plaintiff is negligent, the plaintiff's awareness of a risk is relevant to the plaintiff's degree of responsibility. See § 8.

Whether the defendant reasonably believes that the plaintiff is aware of a risk and voluntarily undertakes it may be relevant to whether the defendant acted reasonably. The defendant might reasonably have relied on the plaintiff to avoid the known risk, or other policy considerations may dictate that the defendant has no duty or a limited duty to the plaintiff. See § 2, Comment j; Restatement Second, Torts § 282. Whether the plaintiff is aware of a risk and voluntarily assumes it may also be relevant to whether the plaintiff's conduct is a superseding cause. See Restatement Second, Torts § 442. Comparative responsibility may affect what constitutes a superseding cause, but that issue is beyond the scope of this Restatement.

[Restatement (Third) of Torts; Apportionment of Liab. § 3 cmt. c (2000).]

Illustration number six of section three of the Restatement specifically addresses the sports stadium scenario and provides that:

A attends a baseball game at B's ballpark. A sits in a portion of the stands beyond the point where the screen prevents balls from entering the seats. A is aware that balls occasionally are hit into the stands. The fact that A knew balls are occasionally hit into the stands does not constitute assumption of risk. The fact that A knew balls occasionally are hit into the stands is relevant in evaluating whether A acted reasonably by engaging in particular types of conduct while sitting in the stands (sitting in the stands would not itself constitute unreasonable conduct). If the factfinder concludes that A did not act reasonably under the circumstances, A's knowledge of the risk is relevant to the percentage of responsibility the factfinder assigns to A. See § 8. If B could reasonably assume that A and other fans are aware that balls are occasionally hit into the stands, this fact is also relevant to whether B acted reasonably in relying on A to watch out for balls instead of constructing a screen or providing warnings.

[*Id.* at cmt. c, illus. 6.]

Accordingly, I would follow the Restatement and apply the business invitee rule and comparative negligence principles to assess liability for injuries caused at a baseball stadium. A trier of fact should consider all of the circumstances to determine whether the owner and operator have breached their duty of care to the plaintiff. That view does not impose a requirement on owners and operators to "guarantee protection for all fans[.]"

*Ante* at 81, 881 *A*.2d at 707. Instead, the application of traditional tort principles, such as comparative negligence, will adequately even out the playing field for both sides. *See* Restatement, *supra.* Simply stated, if the elements of the business invitee rule are present, then the injured fan should have the opportunity to seek redress and a jury should decide whether the owner and operator of the stadium should bear any responsibility for that injury.

## C.

This Court has faced many challenges in the past and, when the occasion warranted, changed the common law for the better. Our tort law has shifted from a contributory negligence perspective to a comparative negligence assessment. Yet, the limited duty rule does not reflect that change because it is still based on the outdated assumption of risk doctrine. Although the majority recognizes that "the beauty of common law is the ability to adapt to the times," *ante* at 84, 881 *A*.2d at 708, the Court's decision to adopt the limited duty rule in the stands represents a missed opportunity to correct a shortcoming in our law.

In this matter of first impression for this Court, we should mark new ground. "[W]isdom too often never comes, and so one ought not to reject it merely because it comes late." *State v. Int'l Fed'n of Prof'l & Technical Eng'rs, Local 195,* 169 *N.J.* 505, 539, 780 *A*.2d 525 (2001) (citations and quotations omitted). The time is ripe for this Court to reject the limited duty rule and to apply traditional business invitee tort principles to professional stadium owners and operators.

Justice RIVERA–SOTO, concurring in part and dissenting in part.

This appeal requires that we address what duty, if any, a baseball stadium operator or its concessionaires owe patrons with respect to a peril unique to sports facilities: objects leaving the playing field that strike and injure patrons. On summary judg-

ment, the trial court held that the limited duty rule set forth in *Schneider v. Am. Hockey & Ice Skating Ctr., Inc.*, 342 *N.J.Super.* 527, 777 *A.*2d 380 (App.Div.), *certif. denied,* 170 *N.J.* 387, 788 *A.*2d 772 (2001), barred the causes of action pressed here. Accepting the trial court's articulation of the limited duty rule, the Appellate Division nonetheless created an exception to the limited duty rule for those patrons who have left their seats and are "in the process of placing orders or reaching for money or accepting the purchases or striking up conversations with others [in] line...." *Maisonave v. Newark Bears Prof'l Baseball Club, Inc.*, 371 *N.J.Super.* 129, 134, 852 *A.*2d 233 (App.Div.2004). Focusing on whether a patron is a "spectator" and distinguishing those instances when the patron/spectator is no longer paying attention to the sporting contest and is otherwise engaged in one of the sports arena's "commercial venture[s] which by its nature induces spectators to let down their guard," the panel held that the baseball stadium operator and its concessionaires "have a concomitant duty to exercise reasonable care to protect [the inattentive spectators] during such times of heightened vulnerability." *Ibid.*

Sustaining, but modifying, the Appellate Division's reasoning, a majority of this Court now "adopt[s] the Appellate Division's opinion in *Schneider*, to the extent that it holds that owners and operators must offer sufficient protected seating to those who would seek it on an ordinary basis and to provide screening in the most dangerous sections of the stands." *Ante,* 185 *N.J.* at 81–82, 881 *A.*2d at 706–07. The majority then defines the area where the limited duty rule applies—the stands—to

include[ ] the stairs that fans ascend and descend to access their seats in the stands. Similarly, areas immediately adjacent to the stands designated as "standing room only," and dedicated solely to viewing the game, fall within the purview of the limited duty rule. In contrast, multi-purpose areas, such as concourses and playground areas, are outside the scope of the rule,....

[*Ante,* 185 *N.J.* at 82, 881 *A.*2d at 707.]

Relying on *Crawn v. Campo,* 136 *N.J.* 494, 503, 643 *A.*2d 600 (1994) for the proposition that " '[r]ecognition of a duty of care, ultimately, rests on considerations of public policy and on notions of fairness,' " *ante,* 185 *N.J.* at 80, 82, 881 *A.*2d at 706, 707, the

majority distinguishes between the areas within a sports facility where the duty of care of the owner/operator is defined by the limited duty rule and those "areas of the stadium outside of the stands," *ante,* 185 *N.J.* at 83, 881 *A.*2d at 708, where the duty of care of the owner/operator "is the business invitee rule, which provides that a landowner 'owe[s] a duty of reasonable care to guard against any dangerous condition on his or her property that the owner either knows about or should have discovered.' " *Ante,* 185 *N.J.* at 86, 881 *A.*2d at 709 (citing *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 434, 625 *A.*2d 1110 (1993)).

Insofar as the majority adopts the limited duty rule of *Schneider v. Am. Hockey & Ice Skating Ctr., Inc.* as the duty of care an owner/operator of a sports facility must meet for the distinct peril of objects leaving the playing field, I concur with the majority's conclusion. However, to the extent the majority creates a hybrid duty of care for exactly the peril addressed by the limited duty rule—a hybrid duty of care that hinges solely on where a plaintiff's volitional acts take him or her and is independent of any act by the party ultimately held liable—I respectfully dissent. I would apply the same duty of care (the limited duty rule) for the same peril (objects leaving the playing field) irrespective of the plaintiff's location when injured.

## I.

### A.

I start from the self-evident proposition that a sports facility is different from any other commercial establishment. As the majority itself acknowledges in the context of this case, "professional baseball is a unique sport because fans actively engage in the game by trying to catch foul balls. Fans often greet out-of-play baseballs with cheers as they dive over walls and rows of seats, risking life and limb, for the thrill of triumphantly claiming the errant ball." *Ante,* 185 *N.J.* at 81, 881 *A.*2d at 706. Given the peril of objects leaving the playing field that is unique to sports facilities, I embrace the limited duty rule as a reasonable and

reasoned accommodation of society's conflicting interests. In *Schneider v. Am. Hockey & Ice Skating Ctr., Inc.*, 342 *N.J.Super.* 527, 533–34, 777 *A.*2d 380 (App.Div.), *certif. denied,* 170 *N.J.* 387, 788 *A.*2d 772 (2001), Judge Skillman traced the development of the duty owed by sports facilities to patrons as follows:

> There are some cases which hold that the operator of a sports facility has "no duty" to provide spectators with protection from flying balls or pucks, because a person who attends a sporting event assumes the risks inherent in watching the sport. However, the more commonly accepted rule is that a sports facility has a "limited duty" of care to protect spectators from flying balls or pucks. Some cases hold that this limited duty may be satisfied by simply affording spectators the opportunity to purchase a ticket in an area that is protected by netting or plexiglass. However, what has come to be recognized as the prevailing rule is that a sports facility operator's limited duty of care has two components: first, the operator must provide protected seating "sufficient for those spectators who may be reasonably anticipated to desire protected seats on an ordinary occasion," and second, the operator must provide protection for spectators in "the most dangerous section" of the stands. The second component of this limited duty ordinarily may be satisfied by the operator providing screened seats behind home plate in baseball and behind the goals in hockey.
>
> Although the operator of a commercial recreational facility, like the operator of any other business, has a general duty to exercise reasonable care for the safety of its patrons, the measure of that duty is "due care under all the circumstances." The critical circumstance that determines the scope of the duty of an operator of a baseball field or hockey rink is that most spectators prefer to sit where they can have an unobstructed view of the game and are willing to expose themselves to the risks posed by flying balls or pucks to obtain that view. Consequently, it is not unreasonable to accommodate this preference, so long as the sports facility operator provides sufficient screened seats for those spectators who may be reasonably expected to request protected seats and also screens any seats that pose an unduly high risk of injury from flying balls or pucks.

[ (citations omitted).]

I cannot improve on, and therefore adopt, Judge Skillman's excellent analysis and would hold that, in respect of the peril of objects leaving the playing field, the operator of a sports facility has a two-part limited duty of care: to provide protective seating in a quantity sufficient to satisfy reasonable demand, and to protect patrons in those areas of the stadium which are most dangerous. I would also hold, consistent with Judge Skillman's conclusions, that the latter requirement is, in large part, "satisfied by the

operator providing screened seats behind home plate in base-ball...." *Ibid.*

## B.

If we are to be consistent in our adoption of the limited duty rule as the standard of care owed by a stadium owner/operator to its patrons, our analysis must be defined and circumscribed by it. The limited duty rule does not immunize a stadium owner/operator from liability to persons injured by objects leaving the playing field. On the contrary, the limited duty rule crystallizes the duty a stadium owner/operator owes in respect of the specific peril of objects leaving the playing field: to provide sufficient screened seats so as to satisfy the demand therefor, and to screen those areas of the stadium where there is an unduly high risk of injury from objects leaving the playing field. We analyze the application of the limited duty rule in stages.

We first inquire whether the plaintiff sought protected seating. If he did so and, while so seated, was injured by an object leaving the playing field, the question that must be addressed is whether the stadium owner/operator provided sufficient protected seating to satisfy demand. If so, then the stadium owner/operator has satisfied his duty of care and no breach of duty—and, hence, no liability—would flow. However, if plaintiff requested protected seating and the stadium owner/operator failed to provide sufficient protected seating so as to satisfy the demand therefor, and if plaintiff was then injured as a result of an object leaving the playing field, then a breach of duty and resultant civil liability follow.

When, as here, a plaintiff is not injured while seated in a protected area, the focus of the inquiry under the limited duty rule shifts to whether the plaintiff's location when injured as a result of an object leaving the playing field was one that carried an unduly high risk of injury from objects leaving the playing field. If so, and if the stadium owner/operator did not screen that area, then the standard of care of the limited duty rule has been breached

and liability follows. However, if the plaintiff's location when injured as a result of an object leaving the playing field was not one that carried an unduly high risk of injury from objects leaving the playing field or was otherwise screened, then the standard of care of the limited duty rule has not been breached and no liability should follow.

An application of these principles to this case leads to the conclusion that plaintiff has failed to demonstrate that his location when injured as a result of a batted ball leaving the playing field was one that carried an unduly high risk of injury from objects leaving the playing field. Indeed, the only proof adduced by plaintiff here was of his own injury; there was no proof of any other injuries at that location arising from objects leaving the playing field. Thus, if we apply the limited duty rule as it is generally understood—and as the majority adopts it before limiting its application—plaintiff's claim must fail.

## II.

Reasoning that "a fair and appropriate accommodation of the competing interests" requires that the application of the *Schneider* limited duty rule be circumscribed to only those injuries suffered from objects leaving the playing field while the plaintiff is located in the "stands," *ante,* 185 *N.J.* at 86, 881 *A.*2d at 709, the majority instead adopts a hybrid standard of care for the same peril: if a plaintiff is located in the stands when injured by an object leaving the playing field, then the duty of care owed is that of the limited duty rule; if, however, the plaintiff is located within the stadium but other than in the stands when injured by an object leaving the playing field, then the duty of care owed is of " 'reasonable care to guard against any dangerous conditions on his or her property that the owner either knows about or should have discovered.' " *Ante,* 185 *N.J.* at 86, 881 *A.*2d at 709 (citing *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 434, 625 *A.*2d 1110 (1993)). According to the majority, this shifting or moveable duty of care—which is triggered not by any act of the party who owes the duty of care,

but instead is activated by a plaintiff merely moving from one part of the stadium to another—is required by " 'considerations of public policy and on notions of fairness.'" *Ante,* 185 *N.J.* at 81, 881 *A.*2d at 706 (citing *Crown v. Campo,* 136 *N.J.* 494, 503, 643 *A.*2d 600 (1994)).

The duty of care owed by an owner/operator of a sports facility to patrons in respect of the peril of objects leaving the playing field cannot be as fickle as the majority would have it. We have consistently held that "[t]he inquiry [whether a duty of care exists] involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." *Goldberg v. Housing Auth. of Newark,* 38 *N.J.* 578, 583, 186 *A.*2d 291 (1962). We have also made clear that,

> [i]n most cases, the justice of imposing such a duty [of care] is so clear that the cause of action in negligence is assumed to exist simply on the basis of the actor's creation of an unreasonable risk of foreseeable harm resulting in injury. In fact, however, more is needed, "more" being the value judgment, based on an analysis of public policy, *that the actor owed the injured party a duty of reasonable care. [Kelly v. Gwinnell,* 96 *N.J.* 538, 544, 476 *A.*2d 1219 (1984) (citation omitted) (emphasis supplied) (holding limited by *N.J.S.A.* 2A:15–5.7).]

It is beyond question that "[a] cause of action founded upon negligence involves a breach of a duty of care that causes injury." *Weinberg v. Dinger,* 106 *N.J.* 469, 484, 524 *A.*2d 366 (1987) (citations omitted). We analyze what duty of care is owed through the dual prism of the peril we seek to protect against *and* the party that owes the duty in the first instance. *Ibid.* ("What precautions are 'reasonable' depends upon the risk of harm involved and the practicality of preventing it. We ordinarily evaluate a defendant's conduct on the basis of what a 'prudent man' would have done in defendant's circumstances."). In determining the duty of care to be imposed, our focus is on the defendant's acts or omissions, not those of the plaintiff.

To be logically consistent, a duty of care imposed on a defendant in respect of an identified peril cannot be altered solely at the whim of the plaintiff because "[t]he risk reasonably to be perceived defines the duty to be obeyed; it is the risk reasonably

within the range of apprehension, of injury to another person, that is taken into account in determining the existence of the duty to exercise care." *Hill v. Yaskin*, 75 *N.J.* 139, 144, 380 *A.*2d 1107 (1977) (quoting 57 *Am.Jur.2d Negligence* § 58 (1970)); *see also Clohesy v. Food Circus Supermarkets, Inc.*, 149 *N.J.* 496, 503, 694 *A.*2d 1017 (1997); *Kuehn v. Pub Zone*, 364 *N.J.Super.* 301, 311, 835 *A.*2d 692 (App.Div.2003).

To that extent, the position advanced by Justice Wallace in his concurrence in the result is the logical analog to what I express in dissent: there should be one, and only one, duty of care in respect of an identified peril, and the creation of shifting duties of care for the same peril is fraught with uncertainty and inconsistency. Thus, although Justice Wallace and I differ in our conclusions— Justice Wallace would jettison the limited duty rule in its entirety in favor of a common law negligence duty of care, *ante*, 185 *N.J.* at 91, 881 *A.*2d at 713, while I would apply the limited duty rule uniformly across all circumstances affected by the peril we seek to control—we agree on the core principle: one and only one standard of care should apply in respect of the peril of objects leaving the playing field.

Finally, the majority understates the burden that its holding places on stadium owner/operators. As the majority recognizes, in a seven year period, "eight minor league baseball stadiums opened in New Jersey alone." *Ante*, 185 *N.J.* at 74, 881 *A.*2d at 702. Each such stadium was designed and constructed under what was then the law in New Jersey: *Schneider's* limited duty rule. Based on diffuse notions of "fairness" that are not tethered to either law or proper public policy,[1] each such stadium now is

---

[1] Lacking something more concrete, the majority characterizes its hybrid rule as one grounded in notions of fairness. Yet, the very facts of this case debunk that analysis. Plaintiff here was an experienced baseball player and fan who, without the need of the warnings provided by defendants, was aware of the peril of objects leaving the playing field. Eschewing either protected seats or, more to the point, protected concession stands where he could purchase the refreshment he sought, plaintiff elected to purchase his beer at an unprotected, albeit

presented with a Hobson's choice: either incur the expenses for substantial retrofitting, or, unless relief is provided through the Legislature, serve as little more than a hothouse for budding tort litigation. To date, the Legislature has seen fit to live with the balancing of interests that the limited duty rule represents. If the Legislature perceives that balancing to be preferable to the hybrid rule the majority embraces, then it may opt to speak to this subject directly.[2]

## III.

The limited duty rule articulated in *Schneider v. Am. Hockey & Ice Skating Ctr., Inc.*, 342 *N.J.Super.* 527, 777 *A.*2d 380 (App.Div.), *certif. denied*, 170 *N.J.* 387, 788 *A.*2d 772 (2001), fairly and appropriately addresses the particularized peril of objects leaving the playing field which confronts members of the public at a sports facility. That limited duty should be all that is required of the owner/operator of a sports facility. The adoption of a hybrid duty of care that depends not on the acts or failure to act of the sports facility owner/operator but instead is triggered by the volitional acts of a patron will lead inevitably to one of two equally unfortunate results: additional litigation, or sports facilities hermetically enclosing the entire playing field so that no object can leave it. Either result is, to me, both unwarranted and a wrongful exercise of judgment. Dismissing plaintiff's complaint in the first instance, the trial court here properly held that

> [t]he argument that [plaintiff's] attention was diverted from the game by his purchase is not determinative of this issue. People move about baseball stadiums to enter, leave, purchase food, use the restrooms, seek autographs, and engage in other related activity during the course of a game. It would pose an undue burden

temporary concession stand. It is unwarranted to state that, under those circumstances, fairness dictates that we jettison the application of the limited duty rule. More to the point, in the context of determining a standard of care for tort liability, an inchoate standard of "fairness" is simply no standard at all.

[2] As the majority recognizes, other states have done so. *Ante*, 185 *N.J.* at 79 n. 3, 881 *A.*2d at 705 n. 3.

upon operators of sports facilities if their legal responsibility to such persons depended upon what they were doing at a given moment. In short, once a spectator, always a spectator—at least until the last out is registered.

Simply said, the trial court had it right.

Because I cannot subscribe to the majority's reasoning as set forth in Parts IV and V of the majority's opinion, *ante,* 185 *N.J.* at 82–87, 881 *A.*2d at 707–10, I respectfully dissent.

Justice LaVECCHIA joins in this opinion.

*Affirmance as Modified/Remandment*—Chief Justice PORITZ and Justices LONG, ZAZZALI, ALBIN and WALLACE—5.

*Concurrence in Part/Dissent in Part*—Justices LaVECCHIA and RIVERA–SOTO—2.