944 A.2d 630

DENISE SCIARROTTA AND PETER SCIARROTTA, PLAINTIFFS–RESPONDENTS, v. GLOBAL SPECTRUM, COMCAST SPECTACOR CO., MERCER COUNTY IMPROVEMENT AUTHORITY, MERCER COUNTY NEW JERSEY, ABC COMPANIES, D/B/A SOVEREIGN BANK ARENA, XYZ PARTNERSHIPS, JOHN DOES AND JANE DOES, (1–10) SAID NAMES AND DESIGNA-

TIONS BEING FICTITIOUS, D/B/A TRENTON TITANS AND/OR D/B/A JOHNSTOWN CHIEFS, AND TRENTON HOCKEY CLUB, L.L.C., EAST COAST HOCKEY LEAGUE, INC., D/B/A EAST COAST HOCKEY LEAGUE, INDIVIDUALLY, JOINTLY, AND/OR IN THE ALTERNATIVE, DEFENDANTS–APPELLANTS.

Argued February 20, 2008—Decided April 10, 2008.

*Scott D. Samansky* argued the cause for appellants (*Fishman & Callahan*, attorneys; *Stanley P. Fishman*, of counsel).

*Lara R. Lovett* argued the cause for respondents (*Stark & Stark*, attorneys; *Ms. Lovett* and *J. Robert Bratman*, of counsel and on the brief).

*Robert C. Neff, Jr.* submitted a brief on behalf of *amicus curiae* New Jersey Devils, LLC (*Wilson, Elser, Moskowitz, Edelman & Dicker*, attorneys; *William J. Riina*, of counsel).

Justice RIVERA–SOTO delivered the opinion of the Court.

The limited duty rule is unique. It applies to sports venues in respect of a specific peril, that of objects leaving the field of play that may injure spectators in the stands. It provides

that a sports venue owner or operator that provides screened seating (1) " 'sufficient for those spectators who may be reasonably anticipated to desire protected seats on an ordinary occasion[,]' " and (2) " 'in the most dangerous section' of the stands," has satisfied its duty of care to those spectators. *Schneider v. Am. Hockey & Ice Skating Ctr., Inc.,* 342 *N.J.Super.* 527, 533–34, 777 *A.*2d 380 (App.Div.) (quoting *Akins v. Glens Falls City Sch. Dist.,* 53 *N.Y.*2d 325, 441 *N.Y.S.*2d 644, 424 *N.E.*2d 531, 533 (1981)), *certif. denied,* 170 *N.J.* 387, 788 *A.*2d 772 (2001); *Maisonave v. Newark Bears Prof'l Baseball Club, Inc.,* 185 *N.J.* 70, 78, 881 *A.*2d 700 (2005) (quoting *Schneider, supra,* 342 *N.J.Super.* at 533–34, 777 *A.*2d 380), *superseded by statute,* New Jersey Baseball Spectator Safety Act of 2006, *L.* 2005, *c.* 362, *N.J.S.A.* 2A:53A–43 to –48.

This appeal requires that we address two aspects in respect of the limited duty rule. First, we must consider whether the limited duty rule applies to the practice or "warm-up" periods that occur before the game is actually played and, second, we must define whether the limited duty rule also includes a duty to warn spectators in respect of objects leaving the field of play. We conclude that the limited duty rule applies to all activities on the field of play, including pre-game warm-ups. We further conclude that the limited duty rule itself does not encompass a separate duty to warn of the peril of objects leaving the field of play. Thus, if a sports venue owner or operator complies with the limited duty rule, it has satisfied its duty of care to patrons in the stands and, in those circumstances, no action in negligence will lie for the peril of objects leaving the field of play.

## I.

This matter comes before us on defendants' motion for summary judgment; therefore, we view the facts in the light most favorable to plaintiff. *Daidone v. Buterick Bulkheading,* 191 *N.J.* 557, 560 n. 1, 924 *A.*2d 1193 (2007); *Soto v. Scaringelli,* 189 *N.J.* 558, 564, 917 *A.*2d 734 (2007) (citing *DiProspero v. Penn,* 183 *N.J.* 477, 482, 874 *A.*2d 1039 (2005)). Those facts are easily summarized.

On January 4, 2003, plaintiff Denise Sciarrotta attended a professional hockey game between the Trenton Titans [1] and the Johnstown Chiefs at the Sovereign Bank Arena in Trenton. . However, her true "purpose for being at the game was to watch her daughter sing the National Anthem." Plaintiff was seated in the stands, six or seven rows from the ice. Vertically, she was located above the Plexiglas protective barrier mounted on the side boards that surround the ice rink and, horizontally, she was outside the areas of the rink surrounding the goals that also are protected by netting that extends above the Plexiglas. Plaintiff did not request to be seated elsewhere; she "thought they were great seats because [she and her husband] had such a view." During the warm-up period preceding the game, when each team had as many as twenty-five pucks in use, an unidentified player took a practice shot at the goal that struck a goalpost and caromed above the Plexiglas, striking and injuring plaintiff.

Plaintiff filed suit against defendants Global Spectrum, Comcast Spectacor Co., Trenton Hockey Club, LLC, the Trenton Titans, the Johnstown Chiefs, and the East Coast Hockey League, Inc., either as the operators of the Sovereign Bank Arena or the owners, operators or responsible parties for the teams playing on the ice that night.[2] She claimed that defendants were negligent in (1) failing to "keep the premises in safe condition;" (2) failing to "exercise proper care;" (3) "caus[ing] a dangerous condition to exist;" (4) "allow[ing] a nuisance to exist;" (5) "fail[ing] to provide proper safeguards and/or warnings on their property;" (6)

---

[1] The team is now known as the Trenton Devils.

[2] Plaintiff also sued the Mercer County Improvement Authority, as owner of the Sovereign Bank Arena. Pursuant to the Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3, the trial court entered summary judgment in favor of the Improvement Authority, concluding that "plaintiff has not presented evidence that would raise [a] material fact as to if there was a dangerous condition on the property" or that "an employee of ... the Improvement Authority created a dangerous condition [by] an act or omission." Plaintiff did not preserve that issue on appeal either before the Appellate Division or before this Court. Therefore, all references to "defendants" are limited to the private-party defendants only.

"fail[ing] to provide proper safe and clear access and use for persons allowed and invited to use the property;" (7) "fail[ing] to keep said property free and clear of any and all dangers and foreign substances;" (8) acting in a manner "otherwise negligent in the maintenance, supervision and construction of the premises;" and (9) acting in a manner "otherwise negligent in the premises." [3] Defendants answered and discovery was conducted. Once discovery was completed, defendants moved for summary judgment, claiming that they had satisfied their limited duty to plaintiff.

In an oral decision, the trial court agreed with defendants. After reviewing the standards applicable to a motion for summary judgment, it explained that *Maisonave, supra,* and *Schneider, supra,* provide for a limited duty whereby sports venue owners and operators are required "to protect spectators within the stands of the stadium from injury" arising from objects leaving the field of play. It observed that, in these circumstances, a "two-pronged test must be satisfied to avoid liability." It defined that test as follows: "First, the operator must provide protected seating sufficient for those spectators who may be reasonably anticipated to desire protected seats on an ordinary occasion, and second, the operator must provide protection for spectators in the most dangerous areas of the stands." Acknowledging the limitation of liability inherent in the limited duty rule, the trial court summarized plaintiff's key arguments as follows:

> Here the plaintiff argues that *Maisonave* should be extended to permit recovery when, although located in the stands, a spectator is injured during warm[-]ups when the spectator is not expected to be watching the rink, and when the spectator has not been made aware of the existence of net[-]protected seats.

The trial court concluded that "[t]he arena fulfilled the first component of the limited duty rule by providing protective seating for spectators who might reasonably have requested it." It observed that "the areas behind the goals had netting" and that

---

[3] Plaintiff's husband, Peter Sciarrotta, also filed a derivative per quod claim against defendants, the viability of which is subject to the survival of plaintiff's claim.

"[t]his netting prevented pucks from entering the stands." It concluded that "[i]f plaintiff wished to be protected from flying pucks, she could[ ha]ve sat in an area of the stands behind the net." It noted that "[t]he evidence before the Court, however, indicates that plaintiff never asked to move her seat, and, in fact, plaintiff testified that she thought she had great seats."

Addressing the second prong of the limited duty rule, the trial court concluded that "plaintiff has presented no evidence to create a genuine issue of material fact that the operator did not provide protection for the spectators in the most dangerous section of the stands." It rejected the opinion propounded by plaintiff's expert because it did "not address the sufficiency of the protective devices installed." It relied instead on a memorandum tendered by defendants that, as early as mid-2002, the East Coast Hockey League had mandated safety netting in excess of the "seating directly behind the goals, which generally is considered to be the most dangerous spectator area in a hockey rink," *Schneider, supra,* 342 *N.J.Super.* at 535, 777 *A.*2d 380, and that, in compliance with that memorandum, safety netting in fact had been installed at the Sovereign Bank Arena. That memorandum, dated July 25, 2002, issued by the president and chief executive officer of the East Coast Hockey League and titled "Netting Mandate for all ECHL Teams," states in full the following:

On June 20, 2002, the Commissioner of the [National Hockey League] mandated the installation of netting for the 2002–2003 playing season. On July 8, 2002, the President and CEO of the [American Hockey League] also mandated use of netting for the 2002–2003 playing season. After consideration of fan safety and in view of the NHL and AHL requirements, I have determined that it is in the best interest of hockey operations in the ECHL to take similar measures, and I am requiring the following mandate under the powers and duties of the President as contained in Article 9.6 of the Bylaws.

IT IS MANDATED THAT: all ECHL Teams must install netting above the glass that borders the corners and the end zones in their rinks. The height and design of the netting configuration may vary due to structural differences from arena to arena, but must be of significant dimension to prevent pucks from entering the spectator areas in the corners and end zones. Member Teams will work with their respective arenas, netting manufacturers and suppliers to determine the system best suited to their arena. Installation of the netting systems must be completed as soon as is practicable.

Plaintiff appealed, and the Appellate Division reversed the judgment of the trial court. *Sciarrotta v. Global Spectrum,* 392 *N.J.Super.* 403, 920 *A.*2d 777 (App.Div.2007). Conceding that "there is no question that netting was in place in the corners and end zones" of the Sovereign Bank Arena when plaintiff was injured, *id.* at 409, 920 *A.*2d 777, the Appellate Division explained that "[t]he critical issues are whether the netting and the customary Plexiglas were, together, sufficient protections to satisfy the limited duty owed by defendants to protect patrons from the ordinary risks of the hockey game experience; or whether, in the circumstances, a higher duty was owed." *Ibid.*

The panel admitted that "[t]o the extent warm-ups are an integral part of the hockey game experience, the limited duty rule might be seen to apply." *Ibid.* Yet, the panel nevertheless reasoned that "the injury here did not occur during a game; rather, it occurred during warm-ups." *Ibid.* Thus, it further adjudged that "[t]he risks are not the same in those two phases of the hockey game experience." *Ibid.* In the end, the Appellate Division concluded that "there are questions of fact to be determined[,]" *id.* at 411, 920 *A.*2d 777, and that "plaintiff [is] entitled to the opportunity to develop [her] proofs, expert and otherwise, within the bounds of *Maisonave,* that more adequately protective steps were available and should have been taken to minimize the risk of harm from the specific activity at issue." *Id.* at 412, 920 *A.*2d 777.

We granted defendants' petition for certification, 192 *N.J.* 293, 927 *A.*2d 1292 (2007), and amicus curiae status to the New Jersey Devils, LLC. For the reasons that follow, we reverse the judgment of the Appellate Division and reinstate the judgment of the Law Division in favor of defendants.

## II.

Defendants' arguments are uncomplicated. They assert that they have complied with the limited duty rule and that plaintiff has failed to advance any facts to create a material issue of fact in respect of that compliance. They also argue that the distinction

drawn by the Appellate Division—between the duty of care owed to spectators during warm-ups and that owed during actual games—is both artificial and impossible to sustain.

Amicus the New Jersey Devils, LLC urges that the Appellate Division confused issues of fact and law, leading to an erroneous reversal of the summary judgment entered by the trial court, and that to assert a higher duty of care during warm-ups as opposed to during games has no support in either the law or the facts.

As she had before the Appellate Division, plaintiff argues that the trial court should not have entered summary judgment against her.[4] She states that the simple numerical difference in the quantity of pucks on the ice during warm-ups as opposed to only one puck during the game—standing alone—gives rise to a heightened duty of care. In plaintiff's view, that heightened duty of care translates into either (1) a duty to warn of a greater risk of pucks leaving the ice during warm-ups, (2) a duty to increase, during the warm-up period only, the area covered by the protective netting, or (3) both. In response to the arguments advanced by amicus, plaintiff reiterates that the Appellate Division properly found that there were genuine issues of material fact that precluded the entry of summary judgment.[5]

### III.

#### A.

We address first whether there are temporal limitations to the application of the limited duty rule. The Appellate Division

---

[4] Plaintiff made no separate submission in opposition to defendants' petition for certification, relying instead on her brief before the Appellate Division.

[5] Plaintiff also argues that amicus relies on an unpublished Appellate Division opinion and that such reliance is misplaced. Because *Rule* 1:36-3 clearly provides that "[n]o unpublished opinion shall be cited by any court[,]" we address neither the argument based on the unpublished opinion advanced by amicus nor plaintiff's reply thereto.

determined that, based on differing levels of distractions, there are sufficient differences between warm-ups and games to warrant a different or heightened duty during warm-ups. Stated in other words, the Appellate Division concluded that the limited duty rule applies only while the game itself is in progress. Because the limited duty rule imposed on a sports venue owner or operator applies when a spectator is located in the stands—and not based on the arbitrary circumstances of whether the spectator is otherwise distracted—we disagree.

In the context of the sport of professional ice hockey, *Schneider, supra*, which we specifically endorsed in *Maisonave, supra*, describes the limited duty rule thusly: "a hockey rink operator has a limited duty to provide a protected area for spectators who choose not to be exposed to the risk posed by flying pucks and to screen any spectator area that is subject to a high risk of injury from flying pucks." *Schneider, supra*, 342 *N.J.Super.* at 530, 777 *A.*2d 380. In respect of the second prong of the limited duty rule—the "spectator area that is subject to a high risk of injury from flying pucks"—*Schneider* explains that "[t]he second component of this limited duty ordinarily may be satisfied by the operator providing screened seats … behind the goals in hockey." *Id.* at 534, 777 *A.*2d 380. In *Schneider*, the Appellate Division rejected that plaintiff's negligence claim because, among other reasons, the "plaintiff did not offer any evidence that the unprotected seats in the side area of the rink pose an unduly high risk of injury from flying pucks." *Id.* at 535, 777 *A.*2d 380.

*Maisonave*, which addressed the liability of a baseball stadium operator in respect of the peril of baseballs leaving the field of play, limited the scope of the limited duty rule; it held that "the limited duty rule, which restricts the tort liability of owners, applies in situations where an injury occurs *in the stands.*" *Maisonave, supra*, 185 *N.J.* at 74, 881 *A.*2d 700 (emphasis supplied). It further held that "public policy and fairness require application of traditional negligence principles in all other areas of the stadium, including, but not limited to, concourses and mezzanine areas." *Ibid. Maisonave* made clear that "the term 'stands'

includes the stairs that fans ascend and descend to access their seats in the stands [ and] areas immediately adjacent to the stands designated as 'standing room only,' and dedicated solely to viewing the game[.]" *Id.* at 81, 881 *A.2d* 700. Significantly, *Maisonave* approved as "apt" the observation made by the Appellate Division that " '[w]hile watching the game, either seated or standing in an unprotected [viewing] area, spectators reasonably may be expected to pay attention and to look out for their own safety.' " *Ibid.* (quoting *Maisonave v. Newark Bears Prof'l Baseball Club, Inc.,* 371 *N.J.Super.* 129, 134, 852 *A.2d* 233 (App.Div.2004), *aff'd,* 185 *N.J.* 70, 881 *A.2d* 700 (2005), *superseded by statute, N.J.S.A.* 2A:53A–43 to –48).[6]

It is undisputed that the hockey rink in the Sovereign Bank Arena is surrounded by a wooden wall topped by Plexiglas; the height of the Plexiglas is greater in the corner areas and behind the goals than it is along the sides of the rink. It is also undisputed that, as required by the July 25, 2002 memorandum from the president and chief executive officer of the East Coast Hockey League, the corners and end zones of that rink have protective netting starting where the Plexiglas ends and rising to a significant height. It is further undisputed that plaintiff was seated in an area on the side of the rink that was not within the corners or end zones of the rink and, thus, was protected by the side boards topped by Plexiglas but no protective netting; plaintiff's seat was above the Plexiglas protective partition. Finally, it is undisputed that plaintiff did not request a seat behind the protective netting and, on the contrary, she was quite pleased with her seat.

Those facts present a textbook case for the application of the limited duty rule that would bar plaintiff's negligence suit. She nevertheless seeks to distinguish her circumstances by claiming that she was injured during warm-ups, when there were as many

---

[6] To the extent *Maisonave* created two separate duties—based solely on the spectator's location—in respect of a single peril—that of objects leaving the field of play—it has been rejected legislatively and superseded by the New Jersey Baseball Spectator Safety Act of 2006, *N.J.S.A.* 2A:53A–43 to –48.

as fifty pucks on the ice, as opposed to a game, when only one puck is on the ice. Although the Appellate Division found merit in that distinction, we believe it is of no legal moment. *Maisonave* geographically restricted the scope of the limited duty rule by limiting its application to injuries to spectators that occur "in the stands," a restriction later rejected by the Legislature. We see no factual, logical or legal reason to similarly restrict the scope of the limited duty rule solely to the temporal limits of the game itself.

Many spectators attend sporting events for the entire experience. Hockey fans arrive early at the rink to watch the warm-ups, some to watch the skill and grace of the players, and yet others to scramble for the pucks the players inevitably lift into the stands for the spectators' delight. Likewise, baseball fans arrive early at the ballpark to attend batting practice, some to watch the prowess of the batters, and some in the hope of catching an errant ball. For spectators, those preliminary activities are an integral part of the game itself.

Logically, the application of dissimilar duties simply because of anticipated temporal changes between many pucks on the ice to but one puck on the ice leaves much to be desired. Its shortcomings are laid bare by the proposal plaintiff advanced during argument: that the stands be cleared of fans during warm-ups and that spectators be allowed entry only after the warm-ups have concluded. That proposal fails to acknowledge some of the core reasons fans patronize ice hockey games and ignores practical considerations.

Finally, unlike *Maisonave's* geographical distinction in respect of the duty of care applied—where the limited duty rule applies for injuries occurring in the stands, while "the proper standard of care for all other areas of the stadium is the business invitee rule, which provides that a landowner 'owe[s] a duty of reasonable care to guard against any dangerous conditions on his or her property that the owner either knows about or should have discovered[,]' " *Maisonave, supra,* 185 *N.J.* at 85, 881 *A.*2d 700 (quoting *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 434, 625 *A.*2d 1110 (1993))—there is no reason at law to create differing duties in respect of

the same physical location based solely on the entirely arbitrary notion of how many pucks are on the ice at any given time or, for that reason, how many different baseballs are in use on the playing field at any given time. The permutations are both endless and senseless. Are fifty pucks at a time too many, but forty-nine are not? Are five baseballs at a time too many, but four are not? Where that line is to be drawn simply begs the question.

The better and more reasoned route is to return to first principles. We have "recognized generally that a purpose of the tort laws is to encourage reasonable conduct, and, conversely, to discourage conduct that creates an unreasonable risk of injury to others." *Gantes v. Kason Corp.*, 145 *N.J.* 478, 489, 679 *A.2d* 106 (1996) (citations omitted). We further have noted that the "deterrent goal of the tort laws is effectuated through the recognition of a duty to exercise reasonable care and the imposition of liability for the breach of such a duty." *Ibid.* (citation omitted). The reasonable conduct we wish to encourage underlies the limited duty rule itself: added protection for those who are reasonably anticipated to request it as well as for those who, absent a request, nevertheless are located in an area of particular, and enhanced, danger. That standard of reasonableness cannot be transformed into some other, different standard simply because the game itself has not yet started, has started but a play is not immediately developing, or has recently ended. Simply said, to demand separate and distinct duties of care in respect of the same peril in the same area based solely on the temporary goings-on on the field of play is impractical and not grounded in reason. Were such a two-tiered duty rule to be adopted, in an abundance of caution, the only reasonable course for a professional sports venue owner or operator would be to comply with the higher standard of care. Otherwise, it would run the risk of being whipsawed between competing duties of care for the same location. In practical terms, that result would eviscerate the limited duty rule, a rule we recently have embraced and have been given no reason to abandon.

Considerations of comity also inform that conclusion. The Legislature recently adopted the New Jersey Baseball Spectator Safety Act of 2006, which defines a "professional baseball game" to "include pre[-]game activities and shall include *any* baseball game or *pre[-]game activity.*" *N.J.S.A.* 2A:53A–45(b) (emphasis supplied). No reason sufficient to override that recent pronouncement and adopt a different definition for the scope of the limited duty in respect of professional ice hockey games has been tendered.

■ For those factual, logical, and legal reasons, we therefore reject the Appellate Division's conclusion that "warm-ups before a hockey game entail different levels of risk than those occurring during the game itself" simply because warm-ups may be considered periods of " '[h]eightened vulnerability.' " *Sciarrotta, supra,* 392 *N.J.Super.* at 410–11, 920 *A.*2d 777 (quoting *Maisonave, supra,* 185 *N.J.* at 85, 881 *A.*2d 700). Consistent with both *Schneider* and *Maisonave,* we reaffirm that, in respect of the peril from objects leaving the field of play, the limited duty rule sets forth the standard of care professional ice hockey rink owners or operators owe to spectators when they are located in the "stands," regardless of the goings-on within the ice rink.

### B.

■ In her complaint, plaintiff alleged that defendants had an independent duty to warn her of the peril of pucks leaving the ice. Plaintiff supports that claim by reference to the New Jersey Baseball Spectator Safety Act of 2006, which requires that, in addition to providing protective netting "behind home plate[,]" *N.J.S.A.* 2A:53A–47(b), baseball stadium owners must post signs conspicuously stating that "a spectator of professional baseball assumes the risk of any injury ... from any of the inherent dangers and risks of such activities ... including being struck by a baseball or baseball bat anywhere on the premises during a professional baseball game." *N.J.S.A.* 2A:53A–48(b). Based on that Act, plaintiff claims that defendants had a duty to warn her of

the peril of pucks leaving the ice rink so that she could make an informed decision as to whether she wished to assume that risk. The Appellate Division tacitly endorsed a duty to warn when it questioned whether "defendants ... warn[ed spectators] about[ ] the special dangers inherent in warm-up activities[.]" *Sciarrotta, supra,* 392 *N.J.Super.* at 411, 920 *A.*2d 777.

Because the limited duty rule establishes the standard of care professional sports venue owners or operators owe to spectators in the stands in respect of the peril of objects leaving the field of play, the imposition of a duty to warn of that same peril would be in addition to, and not in substitution of, the limited duty rule. We therefore approach the suggestion that professional sports venue owners and operators have an additional duty to warn spectators of a self-evident risk with skepticism. Furthermore, we note that, in relying on the New Jersey Baseball Spectator Safety Act of 2006, plaintiff has conflated two separate and distinct concepts: the limited duty rule and a separate duty to warn. As the Act's legislative history makes clear, it was adopted "in response to the recent New Jersey Supreme Court ruling in [*Maisonave*] which ... held that while the 'limited duty rule' ... applies in situations where an injury occurs in the stands, traditional negligence principles apply in all other areas of the stadium." Senate Judiciary Committee, *Statement on Senate Bill 2930, L.* 2005, *c.* 362 (N.J.2005). In essence, and provided certain statutorily defined warnings are given, the Act eliminates *Maisonave*'s two-tiered duty, restricts the limited duty rule solely to providing protective netting behind home plate, and expands the scope of that duty for baseball stadiums to cover the entire stadium, and not just the stands.

This case presents circumstances that would apply the limited duty rule and relieve defendants from liability even under *Maisonave*'s now-superseded two-tiered standards of care, that is, a limited duty to spectators in the stands and a traditional duty of care to those outside the stands. Thus, we must address whether a separate and additional duty to warn arises. As before, we remain of the view that the imposition of different duties of care

for the same peril in the same location confounds the core purposes of tort law and, in the end, may be counterproductive.

Plaintiff's reliance on the duty to warn imposed by the Act, *see* *N.J.S.A.* 2A:53A–48, is misplaced in several respects. First, the Act's duty to warn did not arise until January 2006, three years after plaintiff's injuries occurred. Further, the Act's duty to warn is part of a greater mosaic that modifies the limited duty rule in respect of baseball stadiums. Under the Act, a baseball stadium owner retains the duty "to provide protection for spectators in the most dangerous sections of the stands[,]" a duty that "may be satisfied by having a net behind home plate." *N.J.S.A.* 2A:53A–47(b). Significantly, the Act jettisons—for baseball stadiums—the other element of the limited duty rule: the obligation to " 'provide protected seating sufficient for those spectators who may be reasonably anticipated to desire protected seats on an ordinary occasion.' " *Maisonave, supra,* 185 *N.J.* at 78, 881 *A.*2d 700 (quoting *Schneider, supra,* 342 *N.J.Super.* at 533–34, 777 *A.*2d 380 (internal quotation marks and citation omitted)).[7] In the absence of a similar exchange in obligations—a duty to warn in lieu of the duty to provide protected seating in addition to the protections afforded "the most dangerous section" of the stands—transplanting the Act's duty to warn to the context of a professional hockey game lacks reason. On the whole, then, we reject plaintiff's assertion that defendants owed her a duty to warn of the perils of objects leaving the ice and that defendants' failure to so warn her gives rise to liability.

## IV.

The judgment of the Appellate Division is reversed, and the judgment of the Law Division dismissing plaintiff's complaint with prejudice is reinstated.

---

[7] Because plaintiff was not seated in "the most dangerous section" of the stands at an ice hockey game, *see Schneider, supra,* 342 *N.J.Super.* at 534, 777 *A.*2d 380 (defining "most dangerous section" as "behind the goals in hockey"), that portion of the limited duty is inapplicable here.

Justice LONG, Dissenting.

As this case proves, in a hockey arena, pucks may fly off the ice and into the stands. As a result, a spectator may sustain serious injuries. Indeed, that is exactly what happened to plaintiff Denise Sciarrotta. She contends that she should have been warned of that danger so she could have made an informed decision regarding the risk. I agree.

In *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 625 *A.*2d 1110 (1993), we set forth the standards for determining the existence of a duty. In particular, our inquiry

> involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution. The analysis is both very fact-specific and principled; it must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct.
>
> [*Id.* at 439, 625 *A.*2d 1110 (internal citation omitted).]

In essence, we recognize a duty where foreseeable events that pose a risk of harm require palliative action by those able to prevent the harm. Included within the scope of that duty is the obligation to warn of known or apparent dangers. *La Russa v. Four Points at Sheraton Hotel,* 360 *N.J.Super.* 156, 160–61, 821 *A.*2d 1168 (App.Div.2003) (citing *Clohesy v. Food Circus Supermarkets, Inc.,* 149 *N.J.* 496, 514–16, 694 *A.*2d 1017 (1997)). To be sure, there is no duty to warn where the circumstances are so remote that its imposition would constitute an unfair burden. *Levine v. Kramer Group,* 354 *N.J.Super.* 397, 405, 807 *A.*2d 264 (App.Div.2002) (holding brokers and sellers have no duty to warn of transient social conditions that arguably affect property value).

In this case, there is no need to perseverate over whether there are dangerous areas in a hockey arena or whether the operator of such a facility has a duty to secure the safety of its patrons. We have already declared that because of the potential dangers of flying pucks, a hockey arena operator has certain obligations. It must provide a sufficient number of screened seats for spectators who may reasonably be expected to request them and must

actually screen any seats that pose an unduly high risk of injury from flying pucks. *Maisonave v. Newark Bears Prof'l Baseball Club, Inc.*, 185 *N.J.* 70, 81, 881 *A*.2d 700 (2005) (citing *Schneider v. Am. Hockey & Ice Skating Ctr., Inc.*, 342 *N.J.Super.* 527, 534, 777 *A*.2d 380 (App.Div.), *certif. denied*, 170 *N.J.* 387, 788 *A*.2d 772 (2001)).

Implicit in that well-established, though limited, duty is the obligation to warn hockey patrons of the potential dangers from pucks and of the patrons' ability to insulate themselves by requesting protected seating. Indeed, it makes no sense to devolve on the arena owner a duty to provide protected seating while keeping patrons in the dark over their right to request it. That is not a redefinition of the limited duty rule but only an explication of the patrons' rights thereunder. Accordingly, I would require the following warning to be posted at the ticket booths and in the arena:

DURING WARM–UPS AND HOCKEY GAMES, PUCKS AND OTHER ITEMS MAY FLY OFF THE ICE AND INTO THE STANDS. UNDER NEW JERSEY LAW, A HOCKEY RINK OPERATOR MUST PROVIDE A PROTECTED AREA FOR SPECTATORS WHO CHOOSE NOT TO BE EXPOSED TO SUCH RISKS. YOU HAVE A RIGHT TO ASK FOR SUCH PROTECTED SEATING, AND THE OPERATOR HAS A DUTY TO PROVIDE IT IF AVAILABLE. IF YOU DO NOT DO SO AND ARE INJURED, YOU WILL NOT BE ABLE TO RECOVER MONEY DAMAGES FROM THE OPERATOR.

That warning, which requires so little from the operator, will serve to advise patrons of their ability to protect themselves either by soliciting safe seating or by opting against attending an event in which such seating is not available. Because such a warning is in full conformity with our prior jurisprudence on the subject of duty, and because the majority has failed to recognize that it is an essential element of the limited duty rule that we have adopted, I respectfully dissent.

Justices ALBIN and WALLACE join in this dissent.

*For reversal and reinstatement*—Chief Justice RABNER and Justices LaVECCHIA, RIVERA–SOTO and HOENS—4.

*For affirmance*—Justices LONG, ALBIN and WALLACE—3.