**Opinion issued March 12, 2013**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-12-00433-CV

———————————

**SHIRLEY MARTINEZ AND RICHARD MARTINEZ, Appellants**

**V.**

**HOUSTON MCLANE COMPANY, LLC D/B/A/ HOUSTON ASTROS BASEBALL CLUB, Appellee**

---

**On Appeal from the 295th District Court**
**Harris County, Texas**
**Trial Court Case No. 2011-43267**

---

## O P I N I O N

Shirley and Richard Martinez appeal from the trial court's summary judgment on their premises liability and negligence claims against Houston

McLane Company, LLC d/b/a Houston Astros Baseball Club. We affirm the trial court's judgment.

## Introduction

Shirley Martinez was hit and injured by a batting practice home run before a Houston Astros home game at Minute Maid Park. Leading up to the game, she requested and the Astros donated 250 tickets to benefit members of the 72nd Brigade Special Troops Battalion, a division of the Texas National Guard, and their families. The Astros selected the seat area, Section 153, and donated the tickets to the Texas National Guard Family Support Foundation. These seats are bleacher field level behind the right field wall, which is an area where a fly ball hit during the game would be a home run. Section 153 is not protected by a screen. There is no map or diagram located outside or in the stadium that identifies the section as unprotected.

Martinez and her husband, a member of the Brigade, arrived at the game almost an hour early. From where they entered the stadium, the lack of screening is not visible until a spectator locates the general area of the seats and looks across the field. She did not request seats in a particular section or seats in a screened area. Nor was she told by the Astros that Section 153 was not screened. The Astros web site also did not identify the areas that were protected or unprotected by screens. Minute Made Park has a seating capacity of almost 41,000 seats, of which

2

over 5,000 (or almost one-eighth) are shielded by a protective screen behind home plate.

After entering the stadium, Martinez walked to Section 153 while accompanied by five children of military families she was caring for, including one young child she pushed in a stroller. The players were participating in batting practice at the time. As she was about to descend the stairs to her seat from the concourse, she was stopped by an usher who informed her that she could not take a stroller down to the seats; rather, the stroller had to be stored in a different, designated section of the stadium.[1] Instead of taking the stroller to the storage area, she left the stroller at the top of the aisle and escorted the four older children down to the seats. After seating the four children and arranging for another adult to watch them while she took the young child and stroller to the storage area, she began ascending the stairs while carrying the young child. While her attention was focused on climbing the stairs and her back was to the playing field, she heard someone yell a warning that a fly ball was coming toward her. She shielded the child with her arms and was struck in the face by the ball. She suffered an orbital fracture and corneal laceration.

---

[1] The usher believed that a fire marshal policy prohibited strollers in the seated area.

Martinez and her husband sued the Astros for negligence and premises liability. The Astros moved for a traditional summary judgment on all the Martinezes' claims, which the trial court granted. This appeal ensued.

## Standard of Review

We review a trial court's summary judgment de novo. *Travelers Ins. Co. v. Joachim,* 315 S.W.3d 860, 862 (Tex. 2010); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 848 (Tex. 2009). In conducting our review, we view the evidence in the light most favorable to the nonmovant, crediting evidence favorable to that party if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Fielding,* 289 S.W.3d at 848. When, as here, the trial court's summary judgment order does not specify the grounds on which it was granted, we must affirm the order if any of the asserted grounds for summary judgment are meritorious. *W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex. 2005).

On a motion for traditional summary judgment, the movant has the burden to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.,* 988 S.W.2d 746, 748 (Tex. 1999). The movant may satisfy this burden by conclusively negating at least one essential element of each of the

4

plaintiff's causes of action. *Sci. Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex. 1997).

## Standard of Care/Protective Screening

**1.      Stadium owners and operators owe a limited duty**

This Court held in *Friedman v. Houston Sports Association*, 731 S.W.2d 572, 573 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.), that a stadium owner owes only a limited duty to spectators to protect them from baseballs hit into the stands. Under the limited duty, the stadium owner must provide "adequately screened seats" for all those who wish to sit behind a screen.[2] *Friedman* followed a line of Texas cases refusing to impose a duty on stadium owners to screen all seats or to warn about foul balls.[3] The Fort Worth Court of Appeals relied on *Friedman*'s holding two years later.[4] Thus, the "baseball rule," as this limited duty is often referred to,[5] is well established in Texas.

---

[2]    *Friedman v. Houston Sports Ass'n*, 731 S.W.2d 572, 574 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.) (quoting *McNiel v. Fort Worth Baseball Club*, 268 S.W.2d 244, 246 (Tex. Civ. App.—Fort Worth 1954, writ ref'd)).

[3]    *Id.* (citing, in addition to *McNiel*, *Knebel v. Jones,* 266 S.W.2d 470 (Tex. Civ. App.—Austin 1954, writ ref'd n.r.e.); *Williams v. Houston Baseball Ass'n*, 154 S.W.2d 874 (Tex. Civ. App.—Galveston 1941, no writ); *Keys v. Alamo City Baseball Co.,* 150 S.W.2d 368 (Tex. Civ. App.—San Antonio 1941, no writ)).

[4]    *See Dent v. Texas Rangers, Ltd.*, 764 S.W.2d 345, 345–46 (Tex. App.—Fort Worth 1989, writ denied).

The Martinezes ask us to overrule established precedent and abolish the baseball rule. They contend that it is a "bad rule" providing an "undeserved shield" to stadium owners and does not reflect the realities of baseball in "the modern era." They argue that stadium owners' limited duty is an outgrowth of "the old discarded" assumption-of-the-risk-rule and that "[t]he Texas comparative negligence scheme is well-equipped to examine the actions and inactions of all parties in determining each party's level of culpability." We decline to overrule precedent following the baseball rule for three reasons.

First, the doctrine of stare decisis creates a strong presumption that precedents should be followed to foster "efficiency, fairness, and legitimacy."[6] If courts did not follow precedent, "no issue could ever be considered resolved. The potential volume of speculative relitigation under such circumstances alone ought to persuade us that stare decisis is a sound policy."[7] Stare decisis is important to "give due consideration to the settled expectations of litigants . . . who have

---

[5] *See, e.g.*, David Horton, Note, *Rethinking Assumption of Risk and Sports Spectators*, 51 UCLA L. REV. 339, 345–48 (2003) (discussing genesis and variations of the baseball rule).

[6] *Grapevine Excavation, Inc. v. Maryland Lloyds*, 35 S.W.3d 1, 5 (Tex. 2000).

[7] *Weiner v. Wasson,* 900 S.W.2d 316, 320 (Tex. 1995).

6

justifiably relied on" precedent.[8] Stare decisis "results in predictability in the law, which allows people to rationally order their conduct and affairs."[9] That interest is particularly acute here, since the rule announced in *Friedman* also arose out of a spectator's injuries from a fly ball at an Astros game. Moreover, the rule has been in effect "since the early days of modern baseball."[10] The Astros, therefore, had good reason to rely on this rule in making decisions about protective screening.

While the Martinezes argue that these precedents are not binding because they conflict with subsequent case developments, we disagree. The first of these developments—Texas's adoption of a comparative negligence scheme—does not justify us overruling *Friedman* because in that same case our court specifically rejected the plaintiff's contention that the limited-duty rule should be rejected in favor of comparative negligence.[11] Other courts have also held that the baseball

---

[8] *Id.*

[9] *Grapevine Excavation*, 35 S.W.3d at 5.

[10] *Maisonave v. Newark Bears Prof'l Baseball Club, Inc.*, 881 A.2d 700, 704 (N.J. 2005).

[11] *Friedman*, 731 S.W.2d at 574. We noted that a stadium owner's limited duty does not "eliminate the stadium owner's duty to exercise reasonable care under the circumstances to protect patrons against injury." *Id.*

rule has a sound basis despite the abolition of the assumption-of-the-risk doctrine.[12]

The second of the legal developments relied upon by the Martinezes—the Texas Supreme Court's abolition of the no-duty rule in 1978[13]—is also not a solid ground for displacing this line of cases because the baseball rule does not abolish a duty. As stated by the Fort Worth Court of Appeals in rejecting a similar argument, "a stadium owner *does* have a duty,"[14] albeit a limited one. As described by the Michigan Court of Appeals, the baseball rule does not abrogate premises liability principles; rather, it identifies the stadium owner's duty "with greater specificity than the usual" premises liability standards.[15] As explained by the New Jersey Supreme Court, the baseball rule "establishes a fact-specific standard of care for injuries caused by errant balls at baseball stadiums by accounting for the open and obvious nature of the risk that batted balls pose to fans."[16] The limited duty

---

[12]    *See, e.g.*, *Akins v. Glens Falls City Sch. Dist.,* 424 N.E.2d 531, 533 (N.Y. 1981).

[13]    *Parker v. Highland Park, Inc.,* 565 S.W.2d 512, 517 (Tex. 1978).

[14]    *Dent*, 764 S.W.2d at 346 (emphasis in original).

[15]    *Benejam v. Detroit Tigers, Inc.*, 635 N.W.2d 219, 221–23 (Mich. Ct. App. 2001).

[16]    *Maisonave*, 881 A.2d at 705.

8

doctrine establishes the "'outer limits' of liability"[17] and allows the stadium owner to "fulfill[] its duty of care as a matter of law."[18]

Second, these precedents are not out of step with modern developments in the law. The rule recognized by Texas courts is the majority rule.[19] It continues to

---

[17] *Benejam*, 635 N.W.2d at 223 (quoting *Bellezzo v. Arizona*, 851 P.2d 847, 853 (Ariz. Ct. App. 1992)).

[18] *Friedman*, 731 S.W.2d at 574.

[19] The following jurisdictions adopted the limited-duty rule in cases before 2000: California (*Quinn v. Recreation Park Ass'n*, 46 P.2d 144 (Cal. 1935)); Iowa (*Arnold v. City of Cedar Rapids,* 443 N.W.2d 332 (Iowa 1989)); Louisiana (*Lorino v. New Orleans Baseball & Amusement Co.,* 133 So. 408 (La. Ct. App. 1931)); Minnesota (*Brisson v. Minneapolis Baseball & Athletic Ass'n,* 240 N.W. 903 (Minn. 1932), and *Swagger v. City of Crystal*, 379 N.W.2d 183 (Minn. Ct. App., 1985)); Missouri (*Anderson v. Kan. City Baseball Club*, 231 S.W.2d 170 (Mo. 1950), and *Crane v. Kan. City Baseball & Exhibition Co.*, 153 S.W. 1076 (Mo. Ct. App. 1913)); New York (*Akins*, 424 N.E.2d 531); North Carolina (*Erickson v. Lexington Baseball Club*, 65 S.E.2d 140 (N.C. 1951), and *Cates v. Cincinnati Exhibition Co.*, 1 S.E.2d 131 (N.C. 1939)); Ohio (*Cincinnati Baseball Club Co. v. Eno,* 147 N.E. 86 (Ohio 1925)); Utah (*Lawson v. Salt Lake Trappers, Inc.*, 901 P.2d 1013 (Utah 1995)); Washington (*Perry v. Seattle School Dist. No. 1*, 405 P.2d 589 (Wash. 1965)).

The limited-duty rule was first recognized almost ninety years ago in *Edling v. Kan. City Baseball & Exhibition Co.*, 168 S.W. 908 (Mo. Ct. App. 1914). The rule is not without its critics, however. *See, e.g.*, *Rountree v. Boise Baseball, LLC*, No. 38966, 2013 WL 646277, at *5 (Idaho Feb. 22, 2013) (declining to adopt limited-duty rule because questions about stadium design and protective netting "are appropriate for the Legislature" and "no compelling public policy rationale exists for" the judiciary to adopt the rule); Horton, 51 UCLA L. REV. 339, 365–66; Gill Fried & Robin Ammon, *Baseball Spectators' Assumption of Risk: Is It 'Fair' or 'Foul'?*, 13 MARQ. SPORTS L. REV. 39, 58 (2002).

be applied by courts across the country in the last twelve years.[20] After weighing many of these policies, at least two state legislatures have likewise recognized that stadium owners and operators owe a limited duty.[21]

---

A number of other courts specifically hold that the stadium owner's duty includes providing a net behind home plate. *See Sciarrotta v. Global Spectrum*, 944 A.2d 630, 631–32 (N.J. 2008) (holding that sports venue owner or operator that provides screened seating (1) sufficient for those spectators who may be reasonably anticipated to desire protected seats on an ordinary occasion, and (2) in the most dangerous section of the stands, has satisfied its duty of care to those spectators); *Benejam*, 635 N.W.2d at 221–23 (holding that baseball rule "prevents liability if there are a sufficient number of protected seats behind home plate to meet the ordinary demand for that kind of seating. If that seating is provided, the baseball stadium owner has fulfilled its duty and there can be no liability for spectators who are injured by a projectile from the field."); *Akins,* 424 N.E.2d at 533 ("[T]he owner must screen the most dangerous section of the field—the area behind home plate—and the screening that is provided must be sufficient for those spectators who may be reasonably anticipated to desire protected seats on an ordinary occasion."); *Lawson By & Through Lawson*, 901 P.2d at 1015 (stating that "[t]he area behind home plate is generally conceded to be the most dangerous area of a ball park" and "had a duty to screen the area behind home plate and to provide screened seats to as many spectators as would normally request such seats on an ordinary occasion.").

[20] The following jurisdictions have adopted the baseball rule since 2000: Michigan (*Benejam*, 635 N.W.2d at 225); New Jersey (*Sciarrotta*, 944 A.2d at 631–32); Nevada (*Turner v. Mandalay Sports Entm't, LLC*, 180 P.3d 1172, 1176 (Nev. 2008)); New Mexico (*Edward C. v. City of Albuquerque*, 241 P.3d 1086, 1088 (N.M. 2010)); Virginia (*Thurmond v. Prince William Prof'l Baseball Club, Inc.*, 574 S.E.2d 246, 250 (Va. 2003) (adopting for adult who understands danger)).

[21] *Jasper v. Chicago Nat'l League Ball Club, Inc.*, 722 N.E.2d 731, 734–35 (Ill. App. Ct. 1999) (recognizing that Illinois legislature adopted Baseball Facility Liability Act (745 ILCS 38/1 et seq. (West 1996)) to overrule two cases that had created liability for stadium owners for injuries caused by

Third, we do not overrule long-settled precedent and create a split between sister courts of concurrent appellate jurisdiction "unless there is an extremely compelling reason to do so."[22] No compelling reasons exist here. On the contrary, these precedents and legislative acts are supported by public policy considerations that strike a balance among multiple interests and presumptions about attendance at a baseball game. First, there is the interest of fans who desire the intimate feeling from sitting as close to the action as possible with the possibility of snagging a ball.[23] Second, there is the interest of fans who want protection from injury due to

---

batted balls and to shift expense for such injuries to spectators, unless injury is caused by "the owner's willful and wanton conduct"); N.J.S.A. 2A:53A-43 to -48 (enacting New Jersey Baseball Spectator Safety Act of 2006 and providing that "spectators of professional baseball games are presumed to have knowledge of and to assume the inherent risks of observing professional baseball games" and therefore "an owner shall not be liable for an injury to a spectator resulting from the inherent risks of attending a professional baseball game" provided owner provides "a net behind home plate" and posts statutorily designated warning signs).

[22] *Howeth Invs., Inc. v. City of Hedwig Vill.*, 259 S.W.3d 877, 901 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

[23] Texas courts have relied on this fact. *See Friedman*, 731 S.W.2d at 576 (Cohen, J., concurring) (stating that "the danger from foul balls at baseball games is so well known that it may be judicially noticed" even when it is first time spectator attends baseball game); *Keys*, 150 S.W.2d at 371 (stating that it is matter of "universal common knowledge" that "a flying baseball is capable of inflicting painful, sometimes serious and even fatal, injury" and "may fly in any direction and strike any bystander not on the alert to evade it."). Many other courts have relied on this fact, as well. *Benejam*, 635 N.W.2d at 222, 223 ("[B]aseball patrons generally want to be involved with the game in an intimate way and are even hoping that they will come in

wayward balls.[24] Third, the risk of injury from a ball is considered an inherent risk

of the game.[25] Fourth, most fans who attend the games are aware that objects may

<hr />

contact with some projectile from the field (in the form of a souvenir baseball). In other words, spectators know about the risk of being in the stands and, in fact, welcome that risk to a certain extent. . . . [M]ost spectators . . . prefer to be as 'close to the play' as possible, without an insulating and obstructive screen between them and the action."); *Rudnick v. Golden W. Broadcasters*, 202 Cal. Rptr. 900, 905 (Cal. Ct. App. 1984) ("[T]he chance to apprehend a misdirected baseball is as much a part of the game as the seventh inning stretch or peanuts and Cracker Jack."); *Akins*, 424 N.E.2d at 533 (noting that "many spectators prefer to sit where their view of the game is unobstructed by fences or protective netting and the proprietor of a ball park has a legitimate interest in catering to these desires"); *Maisonave*, 881 A.2d at 706 ("'[M]ost spectators prefer to sit where they can have an unobstructed view of the game and are willing to expose themselves to the risks posed by flying balls . . . to obtain that view.' [F]ans actively engage in the game by trying to catch foul balls. Fans often greet out-of-play baseballs with cheers as they dive over walls and rows of seats, risking life and limb, for the thrill of triumphantly claiming the errant ball.") (quoting *Schneider v. Am. Hockey & Ice Skating Ctr., Inc.*, 777 A.2d 380, 380 (N.J. App. Div. 2001), *cert. denied*, 788 A.2d 772 (N.J. 2001)); *Wells v. Minneapolis Baseball & Athletic Ass'n,* 142 N.W. 706, 708 (Minn. 1913) (stating that "a large part of those who attend prefer to sit where no screen obscures the view" and stadium owners have "a right to cater" to spectators who desire to sit in area without screens).

[24]     *Benejam*, 635 N.W.2d at 223 (observing that "a smaller number of spectators prefer the protection offered by screening").

[25]     *Edward C.*, 241 P.3d at 1098 (stating that limited duty is appropriate when "a risk of physical injury is inherent to the activity"); *Wells*, 142 N.W. at 707–08 (stating that baseball "is necessarily accompanied with some risk to the spectators. . . . But the perils are not so imminent that due care on the part of the management requires all the spectators to be screened in."); *Erickson*, 65 S.E.2d at 141 (stating that duty of baseball park operator to exercise reasonable care to protect its patrons does not extend to "the common hazards incident to the game"); *Brown v. San Francisco Ball Club*,

leave the playing field with the potential to cause injury.[26] As summarized by the

Michigan Court of Appeals,

> The limited duty rule comports more nearly with that everyday reality than would usual invitor-invitee principles of liability. While requiring that protected seats be provided for those who want them, the limited duty rule leaves the baseball stadium owner free, without fear of liability, to accommodate the majority of fans who prefer unobstructed and uninsulated contact with the game. . . . [T]he limited

---

222 P.2d 19, 20 (Cal. Ct. App. 1950) (stating that baseball spectator "subjects himself to certain risks necessarily and usually incident to and inherent in the game"); *Benejam*, 635 N.W.2d at 222 ("The logic of these precedents is that there is an inherent risk of objects leaving the playing field that people know about when they attend baseball games.").

[26] *Edward C.*, 241 P.3d at 1098 (recognizing virtual "impossibility of playing the sport of baseball without projectiles leaving the field of play"); *Benejam*, 635 N.W.2d at 223 (observing that "as a natural result of play, objects may leave the field with the potential of causing injury in the stands"); *Bellezzo*, 851 P.2d at 851 (stating that "the danger of being struck by a foul ball was open and obvious"); *Maisonave*, 881 A.2d at 706 (stating that "'[w]hile watching the game, either seated or standing in an unprotected area, spectators reasonably may be expected to pay attention and to look out for their own safety.' It is the well-understood nature of the game that batted or thrown baseballs can land in the stands.") (quoting with approval *Maisonave v. The Newark Bears, Gourmet Servs.*, 852 A.2d 233, 236 (N.J. App. Div. 2004)); *Brown*, 222 P.2d at 20 (stating that risk of injury from foul ball is "obvious" and that when spectator "voluntarily enter[s] into the sport as a spectator he knowingly accepts the reasonable risks and hazards inherent in and incident to the game"); *Murphy v. Steeplechase Amusement Co.*, 166 N.E. 173, 174 (N.Y. 1929) (Cardozo, J.) (observing that spectator at ball game accepts "the dangers that inhere in it," including "the chance of contact with the ball"); *Quinn*, 46 P.2d at 146 (recognizing that "one of the natural risks assumed by spectators attending professional games is that of being struck by batted or thrown balls.").

duty doctrine represents a good accommodation of the interests that must be balanced in this case . . . .[27]

---

[27] *Benejam*, 635 N.W.2d at 224–25; *see also Edward C.*, 241 P.3d at 1098 (stating that rule must "balance[] the competing interests of spectators who want full protection by requiring screening . . . and allowing other spectators to participate in the game by catching souvenirs that leave the field of play" as well as "the practical interest of watching a sport that encourages players to strike a ball beyond the field of play in fair ball territory to score runs with the safety and entertainment interests of the spectators in catching such balls."); *Maisonave*, 881 A.2d at 702 (noting that rule should "accommodate the interests of both fans and owners" and concluding that "the limited duty rule fairly balances the practical and economic interests of owners and operators with the safety and entertainment interests of the fans"); *Benejam*, 635 N.W.2d at 223, 224 (noting that most spectators prefer to be as "'close to the play' as possible, without an insulating and obstructive screen between them and the action" and the limited duty under the baseball rule is based in part "on the desires of spectators" who can demand protected seating); *Lawson By & Through Lawson*, 901 P.2d at 1015 ("We are persuaded that the policy and rationale of the majority rule are sound. The majority rule insures that those spectators desiring protection from foul balls will be accommodated and that seats in the most dangerous area of the stadium will be safe. At the same time, the majority rule recognizes baseball tradition and spectator preference by not requiring owners to screen the entire stadium."). In balancing these interests, the New Jersey Supreme Court stated:

> [W]e are not prepared to say that the [baseball] rule's time has come and passed. It would be unfair to hold owners and operators liable for injuries to spectators in the stands when the potential danger of fly balls is an inherent, expected, and even desired part of the baseball fan's experience. Moreover, owners and operators would face undue hardship if forced to guarantee protection for all fans in the stands from every fly ball.

*Maisonave*, 881 A.2d at 706–07.

Admittedly, the Martinezes identify other interests that cut against the limited-duty rule: considerations of human safety (which are incorporated into traditional premises liability standards) and equal treatment of all premises owners (as opposed to a carved-out rule for stadium owners).[28] But given the strong presumption that exists in favor of following precedent and the policy considerations supporting the baseball rule, we decline to balance these interests anew and conclude that we should continue to follow our precedent.[29]

## 2. The baseball rule applies equally to the Martinezes' claims of negligence and premises liability

The Martinezes base their claims on negligence and premises liability. The elements of a negligence cause of action are the existence of a duty, a breach of that duty, and damages proximately caused by the breach.[30] Premises liability is a special form of negligence where the duty owed to the plaintiff depends upon the status of the plaintiff—such as the status of an invitee—at the time the incident

---

[28] We also note the absence of any evidence that the unprotected bleacher seats pose an unduly high risk of injury from flying balls. *Cf. Sciarrotta*, 944 A.2d at 636.

[29] The Martinezes do not ask us to limit the baseball rule to seated fans. At least one other jurisdiction has rejected a possible distinction between seated and unseated fans. *See Maisonave*, 881 A.2d at 707 (stating that baseball rule protects from liability those who are hit by baseball in stands, which "includes the stairs that fans ascend and descend to access their seats in the stands").

[30] *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005).

occurred.[31] Thus, in the usual case, the duty analyses for negligence and premises liability claims are closely related but distinct.[32]

In a case where the baseball rule applies, however, the limited duty of the stadium owner is the same regardless of whether the plaintiff's cause of action sounds in negligence or premises liability.[33] Therefore, when the uncontroverted summary-judgment evidence shows that the stadium owner has satisfied its limited duty to provide adequately screened seats for all those desiring them, there is no issue of material fact as to whether the stadium owner fulfilled its limited duty and the trial court may grant summary judgment on both negligence and premises liability claims.[34]

---

[31] *Id.*

[32] *Id.*; *see also Koch Refining Co. v. Chapa*, 11 S.W.3d 153, 156 n.3 (Tex. 1999) (per curiam) ("A premises owner may be liable for two types of negligence in failing to keep the premises safe: 1) that arising from a premises defect, and 2) that arising from an activity on the premises.").

[33] *See Friedman*, 731 S.W.2d at 575 ("The stadium owner's duty is to provide 'adequately screened seats' for all those desiring them."); *see also Turner*, 180 P.3d at 1176 ("[T]he limited duty rule establishes the totality of the duty owed by baseball stadium owners and operators to protect spectators from foul balls within the confines of the stadium.").

[34] *See Dent*, 764 S.W.2d at 346.

16

**3. The Astros demonstrated its compliance with its limited duty**

    **a. The Astros' summary-judgment evidence demonstrated that it provided adequately screened seats**

The Martinezes contend that *Friedman* requires the stadium owner[35] to prove the adequacy of both the quality of the screens and the quantity of the seats protected by those screens. They argue that fact issues exist regarding both. The Astros contend that *Friedman* only requires proof of an adequate number of seats and that it proved that the stadium had an adequate number of seats. In *Friedman*, we declared that a stadium owner owes a duty to "provide[] 'adequately screened seats' for *all* those desiring them."[36]

---

[35] Throughout this opinion we refer to the stadium owner's duties. The same duties (and limitations) apply to a stadium operator.

[36] *Friedman*, 731 S.W.2d at 574 (quoting *McNiel,* 268 S.W.2d at 246). The breadth of the limited duty to provide screening is broader in *McNeil* and *Friedman* than in *Keys v. Alamo City Baseball Co.*, 150 S.W.2d 368 (Tex. Civ. App.—San Antonio 1941, no writ). *Keys* states that there is no duty to provide screens "for all who may apply for them." 150 S.W.2d at 370–71. Rather, the stadium owner's duty to provide screened seats "for as many as may be reasonably expected to call for them on any ordinary occasion." *Id*. at 371. *McNeil* and *Friedman* do not acknowledge the difference in the two rules, discuss the rule stated in *Keys*, or discuss the rationale for their broader rule, although *Friedman* did, in dicta, emphasize the word "all" in light of evidence that there were seats available behind home plate and that the fan did not elect to sit there. 731 S.W.2d at 574. A number of other jurisdictions follow the rule as stated by *Keys*. *See, e.g.*, *Erickson*, 65 S.E.2d at 141 (holding that stadium owner should provide sufficient number of screened seats "to accommodate as many patrons as may reasonably be expected to call for them on ordinary occasions."); *Lawson By & Through Lawson*, 901 P.2d at 1015 (holding that stadium owner "had a duty to screen

17

It is unnecessary for us to determine whether the Astros proved that the quality and quantity of the screened seats were adequate because, first, the quality of the existent screens was not a factor in causing Shirley Martinez's injuries and, second, the Martinezes never requested screened seating.

On the quality of the screens, the Martinezes suggest that the requirement of "adequate" seats refers to the quality of the screen, and that the screen provided by the Astros behind home plate was inadequate in quality because it is a vertical screen that does not provide protection for fly balls that are hit over the top of the screen. We are not aware of any Texas court having considered what type of screen design provides adequate protection for those sitting behind it. We note that the

---

the area behind home plate and to provide screened seats to as many spectators as would normally request such seats on an ordinary occasion."); *Leek v. Tacoma Baseball Club*, 229 P.2d 329, 330 (Wash. 1951) ("There is no obligation to screen all such seats, however, and the proprietor's duty is fulfilled when screened seats are provided for as many as may reasonably be expected to call for them on any ordinary occasion."); *Quinn*, 46 P.2d at 146–47 (stating that stadium owner is not required to provide screened seats for all requesting them; rather, owner's duty is to provide screened seats "for as many as may be reasonably expected to call for them on any ordinary occasion" because even when screen seats are unavailable fans may refuse to accept unprotected seat and demand return of admission); *Rudnick,* 202 Cal. Rptr. at 901–02 (finding duty to provide screened seats to as many as would reasonably request such seats irrespective of owner's decision to screen most dangerous area).

18

Washington Supreme Court and a North Carolina appellate court have rejected a rule requiring a horizontal or overhead screen.[37]

We need not decide this legal issue because of the facts here: Martinez was not sitting behind home plate nor was the fly ball hit behind home plate; rather, the fly ball was a home run ball hit into the bleachers. For the area where the Martinezes were seated, the quality of the screen is simply not at issue because no screen was erected to protect the area where the ball landed.

On the number of seats, the Martinezes argue that the trial court erred in granting summary judgment because the Astros did not present evidence that any of its screened seats were available to Martinez and did not show that the screened area "was sufficient for a reasonable public demand." The Astros did not present any evidence regarding the number of requests it typically receives for screened seats, the sufficiency of the number of protected seats to fill the typical requests for screened seats, or the frequency with which it has to turn away or provide refunds to customers because of the unavailability of screened seating. Nor did it present

---

[37] *Hobby v. City of Durham*, 569 S.E.2d 1, 2 (N.C. Ct. App. 2002) (holding that provision of vertical net, and not horizontal overhead net, was sufficient to discharge stadium owner's duty); *Leek*, 229 P.2d at 331–32 (stating that it is "not uncommon for foul balls to drop over the vertical screen into this section of the stand," that the record did not demonstrate that "foul balls of this kind cause serious injuries with sufficient frequency to be considered an unreasonable risk," that foul balls going over a vertical screen "take longer to reach the seats, and are therefore easier to dodge or catch," and therefore stadium owner did not owe "a duty to provide overhead protection").

19

any evidence regarding whether any seats in the screened area were available to the public on the day in question. The Astros' appellate brief contends that spectators are also protected in the upper deck because foul balls "seldom, if ever, reach" there, but it offered no evidence on how often fly balls reach various areas of the upper deck. Instead, through the affidavit of the Astros' Senior Director of Risk Management, the Astros proved that almost one-eighth of the seats were shielded by a screen located behind home plate. It also submitted photographs depicting that the screen extended from near the part of the first base dugout closest to home plate to near the part of the third base dugout closest to home plate. The Martinezes do not contend that they requested but were denied a screened seat. On the contrary, the evidence establishes that screened seats were available for purchase for the game in question. Therefore, the Astros demonstrated the availability of screened seats for the Martinezes.

### b. The summary-judgment evidence demonstrates that the Astros did not distract Shirley Martinez

On appeal, the Martinezes contend that that a second duty exists: a stadium owner cannot "actively divert[ a spectator's] attention" from the action on the field. According to the Martinezes, the Astros breached such a duty when an usher "instructed [Shirley] Martinez to take certain actions that the usher knew would require Martinez to turn her back to the playing field. The Astros should not hide behind [a] rule of limited duty that imposes an unyielding obligation upon the

20

spectator to pay attention at all times while at the same time the Astros distract the spectator."

We are not aware of any Texas court decision considering whether stadium owners and operators have a duty, apart from their limited duty to provide adequate screened seating, to not distract spectators. The New Mexico Supreme Court recently adopted a rule that includes an inquiry into whether the stadium owner took action to increase the risk to a spectator beyond that inherent in attending a baseball game.[38] On the other hand, the New Jersey Supreme Court recently rejected such a rule, stating that "the limited duty rule imposed on a sports venue owner or operator applies when a spectator is located in the stands—and not

---

[38] *Edward C.*, 241 P.3d at 1097–98 (rejecting baseball rule that limits screened area to area behind home plate provided that screening will provide adequate protection for as many spectators as may reasonably be expected to desire such seating in course of ordinary game but adopting rule of limited duty "given the unique nature of the[] relationship [between stadium owners and fans], as well as the policy concerns implicated by this relationship" by requiring spectators to "exercise ordinary care to protect themselves from the inherent risk of being hit" by ball and owner to "exercise ordinary care not to increase that inherent risk"). Our sister court has noted that the inherent-risk doctrine is distinguishable from the assumption-of-risk doctrine. *Chrisman v. Brown*, 246 S.W.3d 102, 111 n.9 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ("[T]here is a meaningful distinction between implied assumption of the risk—an affirmative defense that applies even if the defendant is negligent—and the inherent-risk doctrine, which is not an affirmative defense but a legal standard for determining whether a sports participant owes a duty at all.").

based on the arbitrary circumstances of whether the spectator is otherwise distracted."[39]

The specific issue of whether a stadium owner should protect a spectator from the risk of injury from a fly ball while walking in an aisle was addressed by a New York court of appeals forty years ago.[40] In that case, the spectator was struck while being conducted by an usher through an aisle leading to his reserved seat in an unscreened section of the stadium. The court, citing earlier New York cases and cases from other jurisdictions, held that the baseball rule applies equally "absent any extraordinary circumstance," when the spectator "is in the aisle and moving to or from his seat."[41] The court reasoned that "[i]f plaintiff is chargeable with knowledge of the risk of injury from a batted ball while he is in his unprotected seat, there would seem no logical basis for considering that he may reasonably be less aware of the same danger in the aisle by which he approaches his seat."[42]

In this case, we need not decide the legal issue of whether the Astros, besides having a limited duty to provide adequate screening, also have a duty to not distract spectators. Even if such a duty exists, the summary-judgment evidence

---

[39] *Sciarrotta*, 944 A.2d at 635.

[40] *Baker v. Topping*, 222 N.Y.S.2d 658 (N.Y. App. Div. 1961).

[41] *Id.* at 660.

[42] *Id.* at 661.

demonstrates that the Astros did not distract Shirley Martinez at the time in question. Shirley Martinez's affidavit states:

> . . . After entering the indoor section of the baseball park and locating the section of seating assigned to us by the Astros, I approached the section of seating and was stopped by an usher who informed me that I was not allowed to enter the seating area of section 153 with a stroller. The usher informed me that I must take the stroller to a different section of the ballpark, on the opposite end of the ballpark. The usher offered no further assistance.

> The usher allowed me to leave the stroller at the top of section 153 while I seated the four older children. I descended the stairs while carrying the baby in my arms. I seated the other four children and left them in the care of another responsible adult with the 72nd Brigade group. I immediately began ascending the stairs with the baby in my arms. My intent was to comply with the usher's instructions and return to take it to the section of the ballpark instructed by the usher. As I began my way up the stairs of section 153, and while my attention was focused on climbing the stairs to comply with the usher's instructions and retrieve the stroller, I heard someone yell a warning that a fly ball was coming toward me. I reacted by shielding the baby I was holding with my arms and body, but was struck in the face by the ball. I held onto the baby and fell to the ground.

Although this evidence demonstrates that Shirley Martinez was ascending the stairs in accordance with an Astros employee's request, it does not demonstrate that the Astros or an Astros agent distracted her at the time that the ball struck her. The facts here are quite unlike those in a California case where a fan was distracted by the antics of the team mascot and the court held that the stadium owner "had a duty *not to increase* the inherent risks to which spectators at professional baseball

23

games are regularly exposed."[43] Rather, the summary-judgment evidence shows that Martinez was simply walking up the aisle, a task that spectators perform frequently during a professional baseball game.

Accordingly, we conclude that the baseball rule applies to the facts presented here. On both negligence and premises liability, the Astros met its summary-judgment burden to prove that it complied with its limited duty to provide an adequate number of screened seats. Additionally, regardless of whether the Astros had an additional duty not to distract spectators, the summary-judgment evidence demonstrates that the Astros did not distract Martinez and thereby increase her risk of injury.

### Duty to Inform of Availability of Screened Seats

The Martinezes also contend that the Astros failed to "inform or otherwise make [Shirley] Martinez or other customers aware of the existence of screened seating" and that the availability of those seats is "not discernible" until a spectator arrives at the stadium. Implicit within this contention is an assertion that the Astros had a duty to advise customers of the existence of such seats. We conclude that the

---

[43]     *Lowe v. Cal. League of Prof'l Baseball*, 65 Cal. Rptr.2d 105, 106 (Cal. Ct. App. 1997) (emphasis in original); *see also id.* at 111 (modifying baseball rule to hold that "the key inquiry [in baseball spectator injury cases] is whether the risk which led to plaintiff's injury involved some feature or aspect of the game which is inevitable or unavoidable in the actual playing of the game").

Astros did not have any duty to provide information regarding this well-known condition of professional baseball parks.

The Fort Worth Court of Appeals considered and rejected this same argument in *Dent v. Texas Rangers, Ltd.*, 764 S.W.2d 345, 346 (Tex. App.—Fort Worth 1989, writ denied). In that case, the spectator invited the court "to impose an additional duty on the stadium owner of informing spectators of the availability of the screened seats."[44] The court declined to do so, stating that "[t]he availability of screened seats is apparent and discernible to all who attend."[45] We agree. As Martinez acknowledged in her affidavit, the screened seating area was visible upon entering the stadium and looking across the field from an aisle.

## Conclusion

We decline to overrule our court's precedent in *Friedman* which adheres to established Texas law adopting the baseball rule. The summary-judgment evidence demonstrated that the Astros complied with its limited duty by providing adequately screened seats. The summary-judgment evidence also demonstrated that the Astros did not distract Martinez. Accordingly, we affirm the trial court's order granting summary judgment. All outstanding motions are overruled as moot.

---

[44]     *Dent*, 764 S.W.2d at 346.

[45]     *Id*.; *cf. Keys,* 150 S.W.2d at 371 (holding that it is unnecessary to "warn[] each person entering the park that he or she would be imperiled by vagrant baseballs").

25

Harvey Brown
Justice

Panel consists of Chief Justice Radack and Justices Higley and Brown.